935 P.2d 555 (1997)
131 Wash.2d 640
SINTRA, INC., an Oregon corporation qualified and doing business in Washington, Keith H. Hamack and Patty L. Hamack, husband and wife and their marital community; Arthur M. Stanley and Susan S. Stanley, husband and wife, and their marital community, Respondents/Cross Appellants,
v.
The CITY OF SEATTLE, a municipal corporation, Holly Miller and John Gayman, her husband; Ovid Thompson, a single person; David Moseley and Jane Doe Moseley, his wife, Beatrice Ryan and John Doe Ryan, her husband, Appellants/Cross Respondents.
No. 62304-0.
Supreme Court of Washington, En Banc.
Argued October 26, 1995.
Decided April 17, 1997.
*558 Mark Sidran, Seattle City Attorney, Robert C. Williams, Asst., Seattle, for appellants.
Richard B. Sanders, Bellevue, for respondents. *556
*557 JOHNSON, Justice.
For a second time, we are asked to review a dispute between Sintra, Inc., and the City of Seattle involving the enforcement of Seattle's former Housing Preservation Ordinance (Ordinance). In Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765 (1992) (Sintra I), we held enforcement of the Ordinance violated substantive due process as unduly oppressive and remanded to the trial court to resolve questions of fact, including whether a regulatory taking had occurred, and, if so, the proper amount of compensation. We also remanded for the trial court to determine whether Sintra was entitled to money damages under 42 U.S.C. § 1983 for the substantive due process violation. The trial court resolved a number of issues on summary judgment, but sent the regulatory takings issue and the § 1983 claim for money damages for the City's conduct after July 15, 1986 to the jury. Following a month long trial, the jury found a taking had occurred for which it awarded Sintra $47,809 compensation. The jury denied Sintra's § 1983 claim for money damages on the basis the City's unconstitutional conduct did not proximately cause any harm to Sintra. The trial court awarded interest on the compensation award in the amount of $60,918.73, having decided not to submit the issue to the jury. The trial court also awarded attorney's fees. Now we are asked, among other things, to determine whether the trial court properly awarded interest on the compensation award and whether Sintra had to prove invidious or irrational conduct on the part of the City as part of a 42 U.S.C. § 1983 action to recover money damages. We hold review of the invidious or irrational conduct requirement is not proper under the law of the case doctrine. Although the trial court correctly found interest was awardable as part of just compensation, the court erred in allowing compound, as opposed to simple, interest. We also find error in the trial court's award of attorney's fees under § 1988. Therefore, we reverse and remand to the trial court to determine the proper amount of interest and attorney's fees in accordance with this opinion. Finding no error with the remaining issues, we affirm the trial court's rulings regarding the punitive damages jury instruction, the City's qualified immunity argument, and Sintra's motion for a new trial.

FACTS
The Ordinance was first enacted in 1980 with the stated purpose of mitigating the loss of low income housing in Seattle and reducing the hardships experienced by displaced tenants. It accomplished this purpose by requiring developers to either replace any low income housing they destroyed or pay a fee into the housing replacement fund. It also required developers to pay tenant relocation fees. In 1983, the Superior Court for King County invalidated the 1980 Ordinance as an invalid tax under RCW 82.02.020. In response, in 1985 the City enacted the Ordinance at issue in this case, which differs only slightly from the original. See San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 21-22, 735 P.2d 673 (1987). We invalidated the housing replacement provisions of the Ordinance as an unauthorized tax in San Telmo Assocs., and, in R/L Assocs. v. City of Seattle, 113 Wash.2d 402, 780 P.2d 838 (1989), we invalidated the tenant relocation provisions for the same reason.
Before our decisions in San Telmo Assocs. and R/L Assocs., Sintra purchased the Larned Hotel located near downtown Seattle.[1] Sintra agreed to pay $640,000 cash *559 for the property, which was dilapidated but home to a few low income tenants. Sintra planned to relocate the tenants and convert the building into a bed and breakfast with retail space on the street level. Before making the offer, Mr. Hamack discussed the Ordinance with the sellers, but it was believed the Larned would be exempted from the Ordinance as a hotel.
Sintra ran into trouble almost immediately after buying the Larned. Unable to obtain financing, Sintra renegotiated the terms of the sale, agreeing to pay an additional $30,000 for the property, $120,000 down, and the remainder in a series of balloon payments over the course of three years. Then, in the first part of 1985, Sintra discovered an adult entertainment business had purchased the abutting building and had been issued a permit by the City. Believing this made the bed and breakfast unfeasible, Sintra put the Larned back on the market and actively solicited development partners. Later, in a claim against the City, Sintra stated the issuance of a permit to the adult entertainment business rendered the Larned "valueless for its intended use and economically unviable for any other use." Clerk's Papers at 11.
By August 1985, a developer had expressed some interest in working with Sintra to convert the Larned into a ministorage warehouse, but was unable to finance the project. Unable to obtain financing or find a buyer, Sintra missed the first $30,000 balloon payment due in March 1985. The sellers eventually declared default and accelerated the note, after Sintra failed to make several more payments.
By the time the sellers had accelerated the note, Sintra had determined the only economically viable use of the Larned was as a ministorage. Thus, Sintra applied for a demolition permit from the City in November 1985. Under the Ordinance, the City assessed a $219,840 demolition fee. Sintra immediately applied for administrative relief from the Ordinance.[2] From the time Sintra applied for administrative relief in November 1985 until the City issued the demolition permit in June 1987, Sintra made repeated requests for relief.[3] Despite Sintra's requests, the City initially denied administrative relief, concluding "the proposed miniwarehouse project [was] not feasible regardless of the housing replacement requirement...." Pls.' Ex. 238 at 1.
Several months after the Superior Court invalidated the Ordinance on July 15, 1986 in the case brought by San Telmo Associates, the City granted Sintra partial administrative relief by waiving the Ordinance fee for development of the ministorage, but no other uses. The City stopped enforcing the Ordinance against Sintra entirely when this court affirmed the Superior Court in San Telmo Assocs. The City issued a demolition permit on April 24, 1987, and a master use permit on June 22, 1987. Had Sintra obtained the permit by the summer of 1986, it was confident it would have been able to go ahead with the ministorage project. But, by April 1987, Sintra thought the market opportunity to develop the ministorage had been lost.
In the middle of all of this, in October 1986, the sellers sued Sintra. After accelerating the note, they had reluctantly concluded Sintra could not develop the property because of the Ordinance and other problems. Sintra counterclaimed for rescission of the sales contract, alleging the sellers' agent misrepresented the value and development potential of the Larned. Sintra eventually prevailed on its counterclaim and obtained rescission of the contract and return of its purchase money.
*560 Based on the City's actions, Sintra sued the City and a number of its employees in 1988. It claimed deprivation of substantive due process, an unconstitutional taking, and interference with business expectancy. The trial court granted summary judgment in favor of the City on Sintra's takings and substantive due process claims. This court reversed. We found the Ordinance violated substantive due process as unduly oppressive. We remanded for the trial court to resolve a number of issues, including whether the City's conduct was invidious or irrational, whether a taking had in fact occurred and, if so, the time period of the taking and appropriate compensation. See Sintra I, 119 Wash.2d at 29, 829 P.2d 765.
On remand, the trial court dealt with most of the claims against the City employees on summary judgment.[4] The trial court also determined on summary judgment that the City's actions taken after July 15, 1986 were irrational, but left for the jury to determine whether the actions proximately caused the alleged injury. In addition, the trial court found the City (not the employee Defendants) violated Sintra's substantive due process rights by enforcing the Ordinance before July 15, 1986, but denied money damages, finding the City had not acted irrationally as a matter of law in enforcing the Ordinance. The remaining claims, including the issues of § 1983 damages for the City's post-July 15, 1986 conduct and the taking, proceeded to jury trial. The City made a CR 68 offer of judgment for $75,000 plus costs and attorney's fees several months before trial.
At trial, Sintra presented several theories of recovery. Sintra argued the City was liable for the income it would have earned from a ministorage during the entire useful life of the ministorage, estimated to be 20 years. In addition, it asked for emotional damages, lost personal income, and lost income from other investments. Sintra's expert, Robert Moss, calculated the income producing potential of the Larned converted to a ministorage as $143,428 per year or $11,952 per month, assuming a 90 percent occupancy rate. Assuming the taking lasted 20 months, he testified Sintra lost $239,047 in net operating income during this time plus several hundred thousand dollars of lost income during the useful life of the project. In total, Moss estimated Sintra's loss, including emotional and other damages, at more than $2 million. In answers to interrogatories, Sintra originally claimed losses of over $100 million.
One of the City's experts, University of Washington Professor Richard Zerbe, testified enforcement of the Ordinance caused Sintra no economic loss. He based his opinion on the fact Sintra knew of the Ordinance when it purchased the Larned. He also testified the project was "doomed" from the start because Sintra paid too much for the Larned. Vern Kelling, a commercial real estate appraiser, testified for the City that the highest and best use for the Larned property during the 1984-1989 period was low income housing. William Partin, CPA, another witness for the City, criticized Moss's methodology and opined Sintra suffered no lost profits because of the Ordinance.
In accordance with its rulings on summary judgment, the trial court instructed the jury that its consideration of the § 1983 claim was limited to determining whether the City's conduct after July 15, 1986 proximately caused Sintra damages. As to the taking, the trial court instructed the jury that if a temporary taking had been proven, Sintra was entitled to the leasehold value of the property for the period during which the Ordinance was wrongfully enforced against it. Further, the trial court instructed the jury that it could award punitive damages on the § 1983 claim.
Sintra proposed a jury instruction on interest that stated a property owner is entitled to interest sufficient to ensure that he or she is placed in as good a position pecuniarily as he or she would have occupied had the payment *561 coincided with the taking. The trial court did not give the proposed instruction and reserved this issue for post-trial consideration. Neither party excepted to the trial court's decision not to submit the interest issue to the jury.
The jury returned a special verdict in which it found enforcement of the Ordinance after July 15, 1986 did not cause injury to Sintra. Thus, it awarded Sintra only nominal damages on the § 1983 claim. The jury did not award punitive damages. As to the takings claim, the jury found a taking had occurred and awarded Sintra compensation of $47,809, but did not specify the time period of the taking. Finally, the jury found the City did not wrongfully interfere with a business expectancy.
Following the verdict, Sintra moved for a new trial or an order correcting the verdict, arguing the taking award was inadequate in light of the evidence.[5] Sintra also submitted memoranda on prejudgment interest and attorney's fees. It claimed $362,024 in prejudgment interest.
The trial court denied Sintra's new trial motion on July 22, 1994. As to the takings award, the trial court stated: "I am fully satisfied that it would invade the province of the jury for the court ... to set aside the jury's verdict as the amount of just compensation...." Oral Ruling (July 22,1994) at 4.
However, the trial court added $60,918.73 of interest to the judgment. It awarded 12 percent interest on the compensation award compounded annually. The trial court also awarded $196,381.87 in attorney's fees and costs of $35,584.20.
The City appealed to the Court of Appeals, Division One, challenging the interest and attorney's fees. Sintra cross-appealed directly to this court, challenging the trial court's dismissal of its claim for damages arising from the enforcement of the Ordinance before July 15, 1986. Sintra also sought review of the jury's failure to award punitive damages and the trial court's denial of Sintra's motion for a new trial on the taking award. Pursuant to RAP 5.3(g), we treated both appeals as filed in this court.

DAMAGES UNDER 42 U.S.C. § 1983
In Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765 (1992) (Sintra I), we found the Ordinance violated substantive due process as unduly oppressive and remanded "for a determination of whether the City's conduct was irrational or invidious." Sintra I, 119 Wash.2d 29, 829 P.2d 765. We explained that when money damages are sought as a remedy under 42 U.S.C. § 1983, as opposed to a judgment invalidating the Ordinance, the conduct that violates substantive due process must be invidious or irrational. See Sintra I, 119 Wash.2d at 23, 829 P.2d 765 (citing R/L Assocs. v. City of Seattle, 113 Wash.2d 402, 412, 780 P.2d 838 (1989)).
Following this decision, the trial court found as a matter of law the City's conduct before July 15, 1986 was not irrational. Thus, the trial court ruled Sintra could not recover money damages for any harm caused by the City's conduct before July 15, 1986. In this appeal, we are asked to revisit our decision in Sintra I and hold that § 1983 provides a damages remedy for substantive due process violations regardless of whether the act violating substantive due process is invidious or irrational.[6] Resp'ts Br. at 15. Our decision in Sintra I constitutes the law of the case. RAP 2.5(c)(2) allows an appellate court to "review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review." We have interpreted this rule to allow review of a previous decision when the decision is erroneous and *562 when justice would best be served by review. See First Small Business Inv. Co. v. Intercapital Corp., 108 Wash.2d 324, 332-33, 738 P.2d 263 (1987). We hold that Sintra has not established our prior decision was erroneous or shown sufficient prejudice to overcome the law of the case doctrine.
Section 1983 was designed to afford plaintiffs a cause of action for constitutional violations on the part of local government bodies and other state officials, and is essentially a constitutional tort. See Rogin v. Bensalem Township, 616 F.2d 680, 686-87 (3d Cir.1980). Because this is a federal cause of action, we are bound by the federal interpretation of § 1983. While numerous state and federal cases address substantive due process in the context of land use permitting decisions, few reported cases address the arbitrary and capricious substantive due process standard in relation to money damages under § 1983.
In Sheerr v. Township of Evesham, 184 N.J.Super. 11, 445 A.2d 46 (1982), the New Jersey Supreme Court discussed the availability of damages under § 1983 for deprivation of substantive due process as a result of excessive regulation. The court found Fourteenth Amendment substantive due process suits for zoning violations could be maintained under § 1983, but it expressed the need for some limiting principle.
This question, in a zoning context, is very troublesome.... A right to collect damages under the Civil Rights Act for an unreasonable and unfavorable regulation, regardless of the amount of loss, would have vast economic consequences for every governmental body exercising regulatory powers. Its stifling effect upon innovative land use planning is obvious....
... Some balancing of public and private interests must take place when remedies for invalid zoning legislation are addressed; if private remedies impose too heavy a burden upon the public, everyone loses. Some restriction of remedies is necessary.
Damages are not the only remedy provided by the Civil Rights Act; injunctive relief and declaratory judgments are available.... Nevertheless, damages may be the proper remedy in a given case, subject to limiting criteria.
Sheerr, 445 A.2d at 71 (citations omitted). Because the court determined a regulatory taking had occurred under the Fifth Amendment, it did not reach the issue of the appropriate limiting criteria for Fourteenth Amendment claims.
Sheerr recognizes that 42 U.S.C. § 1983 provides injunctive, declaratory, or damages remedies; it states, the person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added.) Damages have been rejected as an appropriate form of relief in some § 1983 actions. See, e.g., Jacobson v. Tahoe Regional Planning Agency, 474 F.Supp. 901, 903 (D.Nev. 1979).
Our prior land use decisions addressing money damages clearly support the application of limiting criteria. See, e.g., Presbytery of Seattle v. King County, 114 Wash.2d 320, 332, 787 P.2d 907 (1990), and Orion Corp. v. State, 109 Wash.2d 621, 649, 747 P.2d 1062 (1987), where we recognized strict financial liability would intimidate legislative bodies from making difficult, but necessary, choices. In Presbytery, we stated the remedy for a land use regulation that violates substantive due process is invalidation; "[n]o compensation (which properly belongs with a "taking" analysis) is warranted in the face of a due process violation." Presbytery, 114 Wash.2d at 332, 787 P.2d 907.
In Sintra I, we recognized in some limited circumstances money damages are available and established the limiting criteria as invidious or irrational conduct. Sintra I, 119 Wash.2d at 23, 829 P.2d 765. In doing so, we recognized, as we must, this standard originates in federal arbitrary and capricious substantive due process cases.[7] We will not *563 reexamine the propriety of this limiting criteria in this case in view of the fact Sintra would not have been entitled to money damages under § 1983 for the City's conduct before July 15, 1986 even assuming the City's conduct was invidious or irrational because of the jury's finding regarding proximate cause.
Here, the trial court ruled on summary judgment that the City's conduct after July 15, 1986 was irrational, but its conduct before July 15, 1986 was not. As a result, the only issue related to the § 1983 claim that went to the jury was whether the City's conduct after July 15, 1986 proximately caused harm to Sintra.
The record fully supports the jury's view that the City's conduct after July 15, 1986 did not proximately cause Sintra any harm. By Sintra's own admission, the event that rendered the Larned "valueless for its intended use and economically unviable for any other use"[8] occurred in 1985 when Western Amusement purchased the abutting property. In addition, the jury could have found Sintra's inability to attract developers or obtain financing before it applied for a demolition permit was the substantial factor preventing it from deriving income from the Larned. This finding by the jury as to damages after July 15, 1986 resolves any claim for damages for the City's conduct before July 15, 1986 because the same evidence and conduct is present both before and after July 15, 1986. Under these circumstances, Sintra was not prejudiced because it would not have recovered even had the City's conduct before July 15, 1986 been invidious or irrational. Absent prejudice, we will not reexamine this issue. See RAP 2.5(c).

INTEREST AS AN ELEMENT OF JUST COMPENSATION
When private property is taken for public use, our state and federal constitutions require the payment of just compensation. See Wash. Const. art. I, § 16 (amend. 9); U.S. Const. amend. V. Just compensation requires that the property owner be put in the same position monetarily as he or she would have occupied had the property not been taken. It consists of the full equivalent of the value of the property paid contemporaneously with the taking. See Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74, 93 S.Ct. 791, 793-95, 35 L.Ed.2d 1 (1973); Lange v. State, 86 Wash.2d 585, 589, 547 P.2d 282 (1976); State v. Lacey, 84 Wash.2d 33, 36-37, 524 P.2d 1351 (1974).
In a conventional eminent domain proceeding, property is not taken or damaged until just compensation is paid. But in an inverse condemnation or quick-take action under RCW 8.04.090,[9] property is taken before just compensation is paid. In these cases, we have held that interest is necessary to compensate the property owner for the loss of the use of the monetary value of the taking or damage from the time of the taking until just compensation is paid. See Smithrock Quarry, Inc. v. State, 60 Wash.2d 387, 391, 374 P.2d 168 (1962); see also In re City of Anacortes, 81 Wash.2d 166, 500 P.2d 546 (1972); Consolidated Diking Improvement Dist. No. 3 v. Davis, 36 Wash.App. 125, 672 P.2d 414 (1983); State v. Hallauer, 28 Wash. App. 453, 624 P.2d 736 (1981). We assume a person who received the money value of his or her property as of the date of the taking has a beneficial use available for these funds. See Hansen v. Rothaus, 107 Wash.2d 468, 473, 730 P.2d 662 (1986). Interest in this context is not an award of prejudgment interest on a liquidated sum in the traditional sense, but is a measure of the rate of return on the property owner's money had there been no delay in payment. See United States v. Blankinship, 543 F.2d 1272, 1275 (9th Cir.1976); State Roads Comm'n v. G.L. Cornell Co., 85 Md.App. 765, 584 A.2d 1331, 1337 (1991). The Legislature codified these principles in the quick-take provisions of RCW 8.04.090, making the State liable for *564 interest on the difference between what it pays into the court registry and the amount to which the owner is entitled. See RCW 8.04.092.
These rules apply with equal force in temporary regulatory takings cases because a temporary regulatory taking is no different in kind from a permanent taking, in that compensation is required for the same reason it is required when the State takes property through conventional eminent domain or quick-take proceedings. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); see also In re City of Seattle, 81 Wash.2d 652, 659, 504 P.2d 292 (1972) (requiring interest for period of temporary taking even when the City later abandons its eminent domain proceeding). Because the property owner in a temporary regulatory taking loses the use of the monetary value of the property from the time of the taking until payment is made, interest is usually necessary to place the property owner in the same position he or she would have occupied had the taking not occurred.
RCW 8.28.040, providing for interest in all eminent domain proceedings, appears on its face to apply only to postjudgment interest awards. We have, however, modified this interest rule to apply when interest must commence at an earlier date by virtue of earlier possession. See In re City of Anacortes, 81 Wash.2d at 169, 500 P.2d 546. We hold RCW 8.28.040 also applies in regulatory takings actions and should guide the trial court's award of interest unless a party proves by presenting evidence that the statute does not afford just compensation.
The City correctly points out that municipalities are generally immune from prejudgment interest. See Fosbre v. State, 76 Wash.2d 255, 456 P.2d 335 (1969). Here, however, the interest awarded is not prejudgment interest. The interest awarded is part of the damages and is required as part of just compensation. Therefore, we dispense with the City's immunity argument.
The amount of compensation necessary to satisfy the constitutional mandate is a matter for judicial determination. See Lange, 86 Wash.2d at 589, 547 P.2d 282; RCW 8.04.092; RCW 8.04.110. This should be determined by a jury "unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law." Const. art. I, § 16 (amend.9); see Chelan County v. Navarre, 38 Wash. 684, 80 P. 845 (1905) (act or omission which would amount to waiver of a jury in an ordinary civil action would amount to waiver in a condemnation proceeding); RCW 8.12.090.
Sintra proposed instruction number 66A, which would have submitted the amount of interest to the jury. It stated:
An owner whose property was taken, damaged or interfered with by the government is also entitled to interest on the damage award sufficient to insure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.[10]
Clerk's Papers at 209. The trial court did not give the jury either of Sintra's proposed instructions on interest, instead reserving the issue for post-trial.[11] The City did not except to the trial court's failure to submit the issue to the jury.
*565 After trial, Sintra argued that 12 percent was appropriate, and submitted different calculations based on simple and compound interest and differing time periods. The City argued it was immune from prejudgment interest, and, contrary to its position on appeal, also submitted motions and briefs on the amount of interest the trial court should award.
The trial court awarded $60,918.73 based on 12 percent compounded interest, stating:
In order to fully and fairly compensate one whose property has been taken by the government, I believe that interest on the compensation award should run from the date of the taking.
. . . .
Given the uncertainty as to the basis for the calculation made by the jury and the actual period of the taking that they found, I believe that the most reasonable approach is to say that the taking in this case ended upon issuance of the demolition permit in April of 1987; therefore, interest should accrue at the statutory rate from the date of April of 1987 through today. I do believe it is appropriate to have that interest compounded, again in order to achieve full and fair compensation of the claimants.
Oral Ruling (July 22, 1994) at 5.
While the trial judge in this case did not give Sintra's proposed instruction on interest, we are satisfied no reversible error occurred when the trial court awarded interest post-trial. All of the issues triable to the jury were initially submitted to the jury pursuant to Sintra's CR 38 demand. Neither party objected to or excepted to the trial court's action in reserving the interest issue for post-trial. By not objecting or excepting and submitting argument post-trial, both parties agreed to the trial court's manner of handling this issue.[12] In this appeal, the City now argues the trial judge could not award interest without invading the province of the jury. The City's argument comes too late. It cannot now complain of the trial court's decision when it failed to object at the time the trial court decided to handle this issue post-trial. See Nania v. Pacific N.W. Bell Tel. Co., 60 Wash.App. 706, 806 P.2d 787 (1991) (invited error doctrine). Moreover, there was no reversible error because the jury instructions in this case effectively excluded consideration of the time value of money. The jury was instructed to award compensation on the basis of the leasehold value of the property during the time the Ordinance was enforced. During deliberations the jury asked the trial judge, "[d]oes leasehold value represent gross income or net income after expenses?" He responded "[T]easehold value means the market rental rate for the building during such period as you find a taking to have occurred." Clerk's Papers at 283. While there was trial testimony concerning interest, the jury instructions and conduct of the parties indicate that the jury did not take into account the time value of the delay in payment. Under these particular circumstances, no reversible error occurred. Generally, however, all elements of just compensation should be decided by the same jury unless both parties properly waive jury trial on the interest, and the trial court instructs the jury not to consider the time value of money in its award of compensation.
In awarding compound versus simple interest, however, the trial court erred. Courts, in awarding just compensation, must be guided by equitable principles and the measure of such compensation will vary with the facts. See Lange, 86 Wash.2d at 590, 547 P.2d 282. However, the court, in determining the award of interest as part of the award of just compensation, is guided by RCW 8.28.040. The statute applies to eminent domain proceedings and specifically incorporates the interest rate of RCW 19.52.020, which is 12 percent per annum. Because the statute does not specifically provide for the compounding of interest, only simple interest is allowed. See Caruso v. Local Union No. 690, 50 Wash.App. 688, 690-91, 749 P.2d 1304 (1988); Goodwin v. Northwestern Mut. Life Ins. Co., 196 Wash. *566 391, 83 P.2d 231 (1938). If a party proves by presenting evidence that statutory simple interest does not afford just compensation, the trial court has discretion to award compound interest. Absent such proof, however, a property owner in a temporary regulatory takings case is entitled only to simple interest under RCW 8.28.040 as part of just compensation. In this case, where no evidence was offered from which the trial court could base an award of compound interest,[13] we hold the trial court is guided by and should follow RCW 8.28.040 in calculating interest. We reverse and remand for the trial court to determine the proper interest award in accordance with this opinion.

JURY INSTRUCTION ON PUNITIVE DAMAGES
Sintra argues the trial court improperly instructed the jury on punitive damages by not setting out the factors in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), in the jury instruction, and erred by excluding evidence it offered to support an award of punitive damages.[14] Because municipalities are immune from punitive damages under 42 U.S.C. § 1983, City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the only issue is whether the trial court erred with respect to the individual Defendants (Holly Miller and Ovid Thompson) for their post-July 15, 1986 conduct. Assuming, without deciding, punitive damages are recoverable absent actual damages, we find no error regarding the punitive damages instruction. See Mattison v. Dallas Carrier Corp., 947 F.2d 95, 100 (4th Cir.1991) (cannot recover punitive damages in the absence of actual damages).
Here, the trial court instructed the jury that it could award punitive damages on the § 1983 claim "only if you find [by a preponderance of the evidence] that the conduct of an individual defendant was malicious or taken in reckless disregard of plaintiffs' rights." Clerk's Papers at 278. It also instructed the jury that "[p]unitive damages, if any, should be in an amount sufficient to fulfill their purposes of punishing reprehensible conduct and deterring the defendants and others from similar conduct." Clerk's Papers at 278.
Instructions are sufficient if they permit a party to argue his or her theory of the case, are not misleading, and, when read as a whole, properly inform the jury on the applicable law. See Douglas v. Freeman, 117 Wash.2d 242, 256-57, 814 P.2d 1160 (1991). A "jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." Davis v. Mason County, 927 F.2d 1473, 1485 (9th Cir.1991) (citing Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). Haslip did not say that the jury must be instructed on certain factors; rather it said instructions on punitive damages should be fashioned to describe the proper purposes of punitive damages, so that the jury understands punitive damages are not to compensate the plaintiff, but to punish the defendant and to deter the defendant and others from such conduct in the *567 future. See Morgan v. Woessner, 997 F.2d 1244, 1256 (9th Cir.1993).
In this case, the trial court's instructions focused upon the discretionary nature of the award, the need to punish the Defendant, and the need to deter repetition of such conduct. The instructions adequately allowed each party to argue its theory of the case. See Morgan, 997 F.2d at 1256. As such, there was no error.
Similarly, we find no evidentiary errors. A trial court has broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion. See Industrial Indem. Co. v. Kallevig, 114 Wash.2d 907, 926, 792 P.2d 520, 7 A.L.R.5th 1014 (1990). Sintra cites trial testimony related to this issue but fails to present authority and argument. Absent argument and authority, review is not proper. See In re F.D. Processing, Inc., 119 Wash.2d 452, 455, 832 P.2d 1303 (1992).

ATTORNEY'S FEES
The trial court found Sintra achieved full success on the State takings claim and partial success on the § 1983 claim, and awarded Sintra $196,381.87 in attorney's fees under RCW 8.25.075 and 42 U.S.C. § 1988. The City challenges the award of attorney's fees on three grounds. First, it argues the final judgment did not exceed the offer of judgment[15] by 10 percent absent the prejudgment interest such that Sintra could not recover attorney's fees pursuant to RCW 8.25.075(3) or under 42 U.S.C. § 1988.[16] Second, the City argues Sintra is not entitled to attorney's fees on the § 1983 claim because Sintra recovered only $3 in nominal damages on the § 1983 claim. Finally, the City challenges the hourly fee award to Sintra's lead attorney and the award of attorney's fees to Mr. Hamack. We award interest as part of the required just compensation and find error only in the trial court's award of compound, as opposed to simple, interest. The final judgment, including the award of simple interest, exceeds the City's offer of judgment and the RCW 8.25.075 limit.[17] Thus, we only discuss the City's second and third arguments.
The City argues Sintra is not entitled to attorney's fees on the § 1983 claim incurred after the offer of judgment because it recovered only $3 in nominal damages on the § 1983 claim. We agree. Under 42 U.S.C. § 1988(b), the court may award a prevailing party reasonable attorney's fees as part of the costs. The actual issue on review is whether the trial court abused its discretion in awarding the fees. See Progressive Animal Welfare Society v. University of Washington, 114 Wash.2d 677, 688-89, 790 P.2d 604 (1990). The trial court abuses its discretion when the exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons. See Progressive, 114 Wash.2d at 688-89, 790 P.2d 604.
To qualify for attorney's fees under § 1988, a plaintiff must be a "prevailing party." "[A] plaintiff `prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). A plaintiff winning nominal damages is a prevailing *568 party under § 1988. See Farrar, 506 U.S. at 112, 113 S.Ct. at 573. Because Sintra won $3 of nominal damages on its § 1983 claim, it is a prevailing party for purposes of a § 1988 attorney's fee award.
However, a prevailing party is not always entitled to attorney's fees. The Supreme Court has stated: "In some circumstances, even a plaintiff who formally `prevails' under § 1988 should receive no attorney's fees at all. A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party." Farrar, 506 U.S. at 115, 113 S.Ct. at 575. In Farrar, the petitioner sought damages of $17 million, and was awarded only $1 in nominal damages. The Court concluded:
As we have held, a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his "absolute" right to procedural due process through enforcement of a judgment against the defendant. In a civil rights suit for damages, however, the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury. Whatever the constitutional basis for substantive liability, damages awarded in a § 1983 action "must always be designed `to compensate injuries caused by the [constitutional] deprivation'". When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.
Farrar, 506 U.S. at 115, 113 S.Ct. at 575 (alteration in original) (citations and italics omitted). The Farrar Court found error in the district court's award of attorney's fees and reversed the award. See Farrar, 506 U.S. at 116, 113 S.Ct. at 575-76.
As the Supreme Court explained: "Where recovery of private damages is the purpose of ... civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought."[18]Farrar, 506 U.S. at 114, 113 S.Ct. at 575 (quoting Riverside v. Rivera, 477 U.S. 561, 585, 106 S.Ct. 2686, 2699-700, 91 L.Ed.2d 466 (1986) (Powell, J., concurring)). Here, Sintra recovered only $3 in nominal damages after seeking millions. The trial court, however, awarded $196,381.87 in attorney's fees. Clerk's Papers at 771. Although the trial court stated in its Oral Rulings of July 22, 1994 that the central issue to be addressed in its consideration of an award of attorney's fees under § 1988 was the degree of success obtained by Plaintiffs, the court did not consider this a primary factor in its findings when entering an award. Rather, the court considered other factors, such as the difficulty of the case, the undesirability of the case, and the level of skill necessary to pursue the case properly, and found these factors to be in favor of the Plaintiffs. The court then calculated a fee based on Plaintiffs' success and merely adjusted that fee award downward to compensate for a lack of success on the intentional interference claim and the damages portions of the § 1983 claim. This was error. Recovery of private damages was the primary purpose of Sintra's § 1983 action. Under Farrar, when awarding attorney's fees under § 1988, the trial court should have given primary consideration to the amount of damages Sintra sought as compared to the $3 nominal damages it was awarded. The trial court did not do so. Further, in segregating the claims presented in this case, the court stated that 60 percent of the case concerned § 1983 claims, but included within that percentage the State claim under RCW 64.40.[19] Clerk's Papers at 770.
The trial court abused its discretion. We rule, under Farrar, Sintra is not entitled to an attorney's fee award for its § 1983 claim. Sintra may, however, recover attorney's fees under RCW 8.25.075 for its State takings claim. We reverse the award of attorney's fees under § 1988 and remand for proper *569 determination of attorney's fees for the portion of this case that constituted the State takings claim.
The City also challenges the trial court's determination of Plaintiffs' attorney's hourly fees. A trial court has broad discretion in determining the amount of attorney's fees to be awarded, so long as that award is reasonable and based on tenable grounds. See Progressive, 114 Wash.2d at 688-89, 790 P.2d 604. The reasonableness of an award of attorney's fees is reviewed under the abuse of discretion standard. See Progressive, 114 Wash.2d at 688, 790 P.2d 604; see also Iqbal v. Golf Course Superintendents Ass'n, 900 F.2d 227, 228 (10th Cir.1990) (abuse of discretion standard applies in civil rights actions). Here, the hourly fee award to Sintra's lead attorney was reasonable in light of the evidence submitted and based on tenable grounds. In addition, Mr. Hamack was entitled to attorney's fees. See Leen v. Demopolis, 62 Wash.App. 473, 815 P.2d 269 (1991).

QUALIFIED IMMUNITY
Sintra argues the trial court erred by dismissing its claims against the City's employees on summary judgment on the basis of qualified immunity for the employee's conduct before July 15, 1986.
In Sintra I, this court remanded for the trial court to determine as a matter of law whether the individual Defendants were entitled to qualified immunity because they acted in an objectively reasonable way. See Sintra I, 119 Wash.2d at 26, 829 P.2d 765. Under § 1983, "[g]overnment officials performing discretionary functions are shielded from all liability for civil damages if their `conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sintra I, 119 Wash.2d at 25, 829 P.2d 765 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).
Earlier in this opinion we held we would not reexamine the propriety of the invidious or irrational limiting criteria in view of the fact Sintra would not have been entitled to relief under § 1983 for the City's conduct before July 15, 1986, even assuming the City's unconstitutional conduct was invidious or irrational because of lack of proximate cause. Here too, even if the trial court erred with regard to the individual Defendants, the error was harmless because the jury implicitly held the conduct of the City before July 15, 1986 did not cause Sintra any harm.

MOTION FOR A NEW TRIAL
Finally, Sintra argues the trial court erred by denying its post-trial motion to correct the verdict for a total principal compensation of $239,047 plus interest. Sintra argues that it is undisputed the taking began on the date of its change of use permit application (October 1985) and ended not before April 1987, when the City issued the change of use permit, that is, stopped enforcing the Ordinance. Reasoning the jury adopted Mr. Moss' $11,952 estimated monthly income as the leasehold rate, Sintra concludes the jury miscalculated the compensation award, and its error can be corrected by a simple mathematical calculation.
When exact computation is possible, the court may correct the verdict instead of granting a new trial in an action "upon a contract, or for the injury or detention of property." CR 59(a)(6). Although, Sintra accurately describes the testimony of Mr. Moss, the trial court had no means of determining exactly how the jury determined the amount of computation or whether the jury equated Mr. Moss' income calculations with the leasehold value of the property. Under these circumstances, the trial court properly found it could not correct the verdict without invading the province of the jury.

ATTORNEY'S FEES ON APPEAL
Under RAP 18.1 Sintra is entitled to an award of reasonable attorney's fees in this court. Claims are separated and attorney's fees segregated between successful and unsuccessful claims that allow for the award of fees. See Kastanis v. Educational Employees Credit Union, 122 Wash.2d 483, 501-02, 859 P.2d 26, 865 P.2d 507 (1993). Sintra has prevailed on its takings claim and has also *570 prevailed on its attorney's fee award on the takings claim. We award attorney's fees for the successful portion of Sintra's claims on appeal in an amount to be determined by the Commissioner.

CONCLUSION
We hold review of the invidious or irrational standard is not proper under the law of the case doctrine. We reverse the trial court's awards of interest and attorney's fees and remand for new determinations in accordance with this opinion. We affirm the trial court's rulings regarding the punitive damages jury instructions, the City's qualified immunity argument, and Sintra's motion for a new trial.
DOLLIVER, SMITH, GUY, MADSEN, and ALEXANDER, JJ., concur.
SANDERS, J., not participating.
DURHAM, Chief Judge, concurring.
I concur in the majority's decision to not revisit the analysis of substantive due process set forth in our previous review of this case, Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992) (Sintra I). I write separately to reject Justice Talmadge's analysis of the impact of Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) on our regulatory takings jurisprudence.
Justice Talmadge's arguments that we should reconfigure our entire regulatory takings doctrine into a single analysis under Dolan and that we would have decided Sintra I differently in light of Dolan are based on an erroneous understanding of the scope and holding of that case. Dolan is merely a refinement of the rule announced in Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), which was not only decided before our decision in Sintra I, but before the adoption of our comprehensive regulatory takings framework in Presbytery of Seattle v. King County, 114 Wash.2d 320, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). Dolan `s "rough proportionality" test has already taken its proper place in our takings jurisprudence. See Sparks v. Douglas County, 127 Wash.2d 901, 904 P.2d 738 (1995). Justice Talmadge's proposed new analytical framework would eliminate meaningful protection against the excessive regulation of private property under the guise of clarifying our takings jurisprudence.
I. Development Permit Exactions: The Nollan and Dolan Tests
In Nollan, a building permit for a beach house was conditioned upon the granting of a public easement across the owners' beach property. In response to the argument that the permit condition amounted to a taking of private property, the California court held that the permit condition was sufficiently related to the project's negative impact on the public's access to the beach. Nollan, 483 U.S. at 830-31, 107 S.Ct. at 3145-46. The United States Supreme Court reversed.
The Court first noted that a taking clearly would have occurred if the State had simply demanded a public easement rather than conditioning the owners' permit on the granting of such an easement. Nollan, 483 U.S. at 831, 107 S.Ct. at 3145-46. However, the Court also observed that the negative impacts of the owners' project might have justified the outright denial of the building permit, and that such a restriction would not necessarily constitute a regulatory taking if the restriction substantially advanced "`legitimate state interests.'" Nollan, 483 U.S. at 834, 107 S.Ct. at 3147 (quoting Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). These considerations led the Court to announce the general rule now used to determine whether development permit exactions amount to a taking of property.
[A] permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking.

Nollan, 483 U.S. at 836, 107 S.Ct. at 3148 (emphasis added). Applying its new rule, the Court simply assumed that an outright denial of the building permit, based on the State's interest in public access to the beach, would not constitute a regulatory taking.
*571 Nollan, 483 U.S. at 836, 107 S.Ct. at 3148. The Court then tested the State's claim that the permit condition was "reasonably related" to the negative impact of the proposed project. Nollan, 483 U.S. at 838, 107 S.Ct. at 3149. The easement condition was held to be a taking because it did not serve the same governmental purpose as the asserted justification for that conditionthere was no logical "nexus" between the negative impact of the project and the need for a public easement across the owners' property. Nollan, 483 U.S. at 837, 107 S.Ct. at 3148-49.
The Supreme Court granted certiorari in Dolan "to resolve a question left open by [Nollan] of what is the required degree of connection between the exactions imposed by the city and the projected impacts of the proposed development." Dolan, 512 U.S. at 377, 114 S.Ct. at 2312. In Dolan, the City of Tigard conditioned a building permit for a small shopping center on the dedication of two sections of the owner's property: one section for open space within the flood plain of a nearby creek and another for a bicycle path. Dolan, 512 U.S. at 379-81, 114 S.Ct. at 2314. The Court found the necessary "nexus" between the required dedications and the traffic and stormwater impacts of the proposed development. Dolan, 512 U.S. at 387-89, 114 S.Ct. at 2318. Having considered a variety of tests, the Court determined that the Fifth Amendment further required "rough proportionality" between the exaction and the impact of a proposed development. Dolan, 512 U.S. at 391-93, 114 S.Ct. at 2319-20.[1] We adopted and applied this new test in Sparks, 127 Wash.2d at 914-16, 904 P.2d 738.
II. The Scope of Nollan and Dolan
Nollan and Dolan are development permit exaction cases. They represent a subspecies of takings cases which usually involve physical invasions of private property. Nollan and Dolan "are certainly important taking decisions, but, correctly analyzed, they are not regulatory taking cases." William B. Stoebuck, Regulatory Takings, in Wash. Law School Found., Continuing Legal Educ., Land Use Certification Program, Dec. 18-21, at 4 (1995). Nollan and Dolan do not inform the doctrine of regulatory takings, which is concerned with overly burdensome restrictions on the use of private property.
Dolan's "rough proportionality" requirement is only a refinement of the Nollan test for whether a permit condition on a proposed land use is sufficiently related to a legitimate state interest which would justify the denial of the proposed use. A Dolan analysis proceeds from the same threshold assumption as the Nollan nexus inquiry that a total denial of the proposed land use, based on the same police power purposes, would not amount to a regulatory taking. It must be recalled that the Nollan Court assumed, without actually deciding, that the public's interest in access to the beach was a "legitimate state interest" such that the denial of the proposed project on this basis alone would not amount to a regulatory taking.[2] The Dolan Court similarly assumed that the negative impacts of the proposed project would fully justify the City's refusal to allow the project, and that such a refusal would not amount to a regulatory taking.[3]
*572 In Sparks, we noted in passing that a short subdivision plat could not be approved without appropriate provisions for the negative impacts of the proposed development. Sparks, 127 Wash.2d at 913, 904 P.2d 738. Nevertheless, our Sparks opinion made the threshold assumption of its analysis under Nollan and Dolan abundantly clear.
The theory underlying [development exactions] is that if denial of a development permit does not constitute a taking of property, then neither is it a taking if instead the government imposes a condition on the development which serves the same legitimate police power purpose as denial of a permit, even if that condition involves dedication of land.
Sparks, 127 Wash.2d at 907-08, 904 P.2d 738 (emphasis added) (citing Nollan, 483 U.S. at 836, 107 S.Ct. at 3148).
Nollan, Dolan, and Sparks never actually analyzed whether the hypothetical denial of the proposed land use would have effected a regulatory taking.[4] Nevertheless, a development permit exaction could be challenged on grounds that an outright denial of the proposed land use would amount to a regulatory taking. If it were determined that the asserted state interests would not justify the outright denial of the proposed land use and that a denial of the proposed use would therefore constitute a regulatory taking, an analysis of whether the permit conditions also amounted to a taking under Nollan and Dolan would not be necessary.
A determination of whether a particular restriction on the use of private property amounts to a regulatory taking is outside the scope of a Dolan analysis. Beyond clarifying the Nollan test for determining whether a development permit exaction amounts to a taking of property, nothing in Dolan purports to modify or build upon the existing regulatory takings doctrine. It must be noted that Dolan makes only a single passing reference to the Supreme Court's most recent statement on the law of regulatory takings, Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). See Dolan, 512 U.S. at 385 n. 6, 114 S.Ct. at 2316 n. 6. Justice Talmadge's effort to construct a whole new regulatory takings framework based on Dolan fails to recognize the limited role of the Dolan analysis in the larger takings doctrine.
III. An Analysis of the Housing Preservation Ordinance under Dolan
We have already declined to analyze Sintra's regulatory takings claim under Nollan Sintra I, 119 Wash.2d at 16 n. 7, 829 P.2d 765. Were we to analyze the Seattle Housing Preservation Ordinance (HPO) in light of Dolan, we would almost certainly hold that the HPO effected a regulatory taking of Sintra's property. A Dolan analysis of the HPO restrictions on Sintra's proposed land use would require a threshold determination that an outright denial of that proposed use, based on the same negative impacts which are submitted as justification for the HPO conditions, would not effect a regulatory taking of Sintra's property. The critical consideration would be whether Sintra was singled out to bear a burden which should have been borne by the public as a whole. See Nollan, 483 U.S. at 835 n. 4, 107 S.Ct. at 3148 n. 4.
We have already held that the HPO went far beyond the prevention of the anticipated harm of Sintra's proposed use of its property, and imposed a burden to provide an affirmative public benefit, a burden which should *573 have been borne by the public as a whole.[5] Based on this effect of the HPO, it has already been determined that the denial of Sintra's proposed land use under the HPO amounted to a regulatory taking. Thus, under a correct analysis of the threshold issue, we would never reach Justice Talmadge's proposed inquiry into whether the HPO demolition fee was "`roughly proportional' to the public benefit." Concurrence/Dissent at 582.
IV. Justice Talmadge's Proposed New Analysis of Dolan
Justice Talmadge not only stretches the Dolan analysis beyond its proper context in development permit exactions, the proposed framework omits the necessary threshold inquiry into whether a denial of proposed land use would be justified in the first instance. The resulting test provides very little protection from excessive regulation of private property. Under Justice Talmadge's proposed analysis, a restriction on the use of property is not a regulatory taking as long as "(1) the challenged regulation advances a legitimate state interest; (2) there is an `essential nexus' between the interest advanced and the requirement exacted; (3) there is a roughly proportional relationship between the benefit to the public and the cost to the landowner." Concurrence/Dissent at 582 (citations omitted).[6] This test effectively eliminates most of our existing substantive protections against the excessive regulation of private property.
The first element of Justice Talmadge's new framework does not accurately state the test for whether a given restriction on the use of property amounts to a regulatory taking. While a land use regulation that does not advance a legitimate state interest is a taking, the reverse is not necessarily true. Guimont v. Clarke, 121 Wash.2d 586, 595, 854 P.2d 1 (1993), cert. denied, 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563 (1994) (citing Presbytery of Seattle v. King County, 114 Wash.2d 320, 330, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990)). Even regulations that advance a legitimate state interest may constitute a regulatory taking if they require the property owner to provide an affirmative public benefit, destroy a fundamental attribute of ownership, or deny the owner all economically viable use of the property. Guimont, 121 Wash.2d at 595, 854 P.2d 1.
The second and third elements of Justice Talmadge's proposed test would require a nexus and rough proportionality between the burden of the restriction on the use of property and the resulting "benefit to the public." Concurrence/Dissent at 582. This formulation overstates the range of legitimate state interests which may justify a development permit exaction under Dolan. The "rough proportionality" test measures the relationship between the conditions placed on the use of property and the negative impacts of that use that would justify the denial of the proposed use in the first instance. Sparks, 127 Wash.2d at 914-16, 904 P.2d 738. Only those negative impacts may be weighed against the burden of exactions or other conditions on the proposed land use. Sparks, 127 Wash.2d at 914-16, 904 P.2d 738; see also Presbytery, 114 Wash.2d at 336 n. 30, 787 P.2d 907. A restriction or condition on the use of property which goes beyond the prevention of harm to provide an affirmative "benefit to the public" may constitute a regulatory taking. Guimont, 121 Wash.2d at 595, 854 P.2d 1.
The combined effect of Justice Talmadge's new test would be to eliminate meaningful *574 "as applied" challenges under our existing regulatory takings framework. In an "as applied" challenge, our regulatory takings analysis considers: "(1) the regulation's economic impact on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action." Guimont, 121 Wash.2d at 596, 854 P.2d 1 (citing Presbytery, 114 Wash.2d at 335-36, 787 P.2d 907; Robinson v. City of Seattle, 119 Wash.2d 34, 51, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992)). Under Justice Talmadge's proposed new test, these factors are never considered.
Conclusion
Contrary to Justice Talmadge's analysis, Dolan does not require, or even support, a reconfiguration of the regulatory takings framework that we developed in Presbytery and refined in Sintra I, Robinson, and Guimont. The only recent Supreme Court authority to shed any light on our regulatory takings analysis is Lucas. We have already updated our regulatory takings doctrine to reflect the Court's analysis in that decision. Guimont, 121 Wash.2d at 598-601, 854 P.2d 1.
Although Dolan did not offer any specific guidance on the future direction of Supreme Court regulatory takings jurisprudence, the Court has signaled that the protection for private property created by the takings clause of the Fifth Amendment should not be "relegated to the status of a poor relation" with respect to other constitutional rights.[7] In the absence of Supreme Court precedent indicating that our regulatory takings jurisprudence has already gone too far, we should not dismantle those reasonable protections for private property that we have recognized in our prior decisions.
TALMADGE, Justice. (concurring in part, dissenting in part)
While cases arising from governmental restrictions on land use have proliferated in both state and federal courts, Washington jurisprudence, now hopelessly out of date, gives little guidance to policymakers, developers, counsel, or the lower courts as to the basic tenets of recovery for excessive government regulation of land. The majority opinion answers the questions at bar, but does not modernize our land use law. I propose what I believe to be a sound analytical approach to recovery for excessive government regulation in keeping with recent developments in the United States Supreme Court.
I dissent on the cost and attorney fee issues, which both parties have appealed. Also, I do not find Sintra was damaged at all by any actions of the City of Seattle. Because the City has not appealed the jury's conclusion Sintra sufferd a $47,809 loss by a regulatory taking, I am constrained to acquiesce in that conclusion.

FACTS
Our decision in Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765, cert. denied, Robinson v. City of Seattle, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992), discussed the facts as they appeared in limited form on appeal from summary judgment. The majority discusses some of the facts as developed at trial. A more complete review of the record, particularly as to damages, is necessary to a full understanding of this case.
Sintra, Inc., is an Oregon corporation owned by two married couples, the Hamacks and the Stanleys; it owned and operated an auto paint franchise in the Renton area. Keith Hamack is an attorney who was in the private practice of law in 1984. In 1984, the Hamacks also ran a travel agency called Globe Travel. Globe Travel experienced negative cash flow in 1983 and 1984, and Globe Travel was involved in litigation for nonpayment of the sale note; Sintra was also involved in litigation with the auto paint franchiser over advertising fees.
Globe Travel needed a better, more visible location for its office. Keith Hamack looked at the Larned Hotel as a possibility. The Larned was located at 7th and Westlake in Seattle; it also fronted on Lenora Street. It was dilapidated and occupied by a few elderly *575 tenants who paid monthly rent. Hamack believed the Larned could be renovated, with the first floor of the building used for Globe Travel and the other floors for a bed and breakfast.
After extensive negotiations with the seller, the Schoning group, Sintra purchased the Larned in September 1984 for $670,000. Sintra's own real estate agent, Wade Cole, later testified he thought the property was worth only $300,000 to $400,000 at that time. Sintra paid $120,000 down, with monthly interest-only payments of $6,000, and balloon payments every six months over a three year span. The principals of Sintra were personally liable on the note.
Sintra negotiated with the seller over the seller's intent to place in the purchase and sale agreement a disclosure that the building was subject to Seattle's Housing Preservation Ordinance (HPO).[1] Hamack did not want such a disclosure in the conveyance documents, as he thought it would hamper Sintra's ability to obtain financing. The seller agreed to make the disclosure of the HPO to Sintra the subject of a private letter. Sintra was specifically advised in the letter: "Purchasers hereby acknowledge that they have been advised by sellers that the City of Seattle may take the position that the present use of the property may not be altered." Report of Proceedings at 1039. Thus, Sintra knew about the HPO when it purchased the Larned in September 1984.
Sintra was not worried about the HPO then, because it had arranged for the relocation of the Larned tenants and was intending continued residential occupancy for the building. The HPO required owners who wished to move tenants out of residential buildings to arrange for the relocation of those tenants, which Sintra did. Hamack knew the HPO would not apply to the bed and breakfast.
In early 1985, Sintra learned a company interested in establishing an adult entertainment enterprise intended to purchase the building immediately adjacent to the Larned. Sintra attempted to find joint venturers who would raise the capital necessary to purchase the adjacent building, thereby preventing the opening of the adult entertainment establishment Sintra was unsuccessful, and the adult entertainment venture ultimately purchased the land in June 1985, immediately obtaining a license for adult entertainment.
At this point, Sintra abandoned plans to operate a bed and breakfast directly adjacent to the planned adult entertainment store, and began looking for alternative ways to develop the Larned property. The City rejected Sintra's suggestion of a joint enterprise to build low-cost housing.
Sintra does not claim the HPO caused the bed and breakfast project to fail, however. Hamack testified he was unable to obtain financing for the bed and breakfast project even before he learned of the adult entertainment project. From August 1984 to February or March of 1985, Sintra was unable to arrange financing. Sintra's original plan was to obtain financing by the end of 1984.
Unable to proceed with its original project, Sintra listed the building for sale for $1,100,000 in May of 1985. Sintra also stopped paying on its note to the Larned sellers about this time. It missed the $30,000 balloon payment due in March 1985 because it was financially unable to make the payment.
Sintra had received no acceptable bids for the Larned by mid-1985. Eager to salvage what was turning out to be a bad investment, Sintra had then decided to convert the Larned into a mini-storage warehouse, requiring demolition of the building. Demolition of housing units triggered another aspect of the HPO, requiring a payment of $219,000 by Sintra to obtain a demolition permit. Based on a consultant's rough cost projections in the summer of 1985, Sintra claimed it could not profitably convert the property into a mini-storage warehouse and pay the $219,000 demolition fee. Sintra asserted *576 in its trial brief that the consultant "agreed to finance the project." Sintra's Trial Br. at 21; Clerk's Papers at 2125. At the trial, however, the consultant testified his dealings with Hamack never got past the "preliminary negotiations, rough proposal stage," and because of the applicability of the HPO, he never pursued the project with Sintra. Report of Proceedings at 494-95. The consultant and his partner offered only to be guarantors of the loan Sintra was seeking.
But the HPO demolition fee was not the reason Sintra could not proceed with the mini-storage warehouse. Hamack testified the mini-storage warehouse proposal, even without the HPO fee, did not "pencil out" because of the "equity gap." Report of Proceedings at 1466. The equity gap without the HPO fee was $323,832; with the HPO fee, the gap was $573,832. Hamack testified if Sintra left the $300,000 already invested in the Larned in the project, the equity gap would have been less by that amount. In other words, if Sintra had simply abandoned the money already put into the project, renounced its equity in the Larned, the equity gap would have been no greater than $23,000 without the HPO fee. Although Hamack testified he was not demanding to get his $300,000 "back off the top" prior to the construction of the mini-warehouse, he notably did not testify he was willing to abandon forever his equity interest. Report of Proceedings at 1475. Hamack also testified it would have taken six months after obtaining a permit for the mini-storage to begin operations.
The equity gap was the result of Sintra's having paid too much for the building. Sintra alleged in its counterclaim against the Schoning group that one of the facts the sellers failed to reveal to Sintra prior to the sale was the Larned was really worth less than $450,000. Hamack himself, by the fall of 1985, concluded the building was worth only $300,000 to $400,000.
On September 25, 1985, the Schoning group declared Sintra to be in default of its payment obligation for the Larned, and later sued Sintra for failure to pay on the note. Sintra filed a counterclaim in that action, asserting an agent of the sellers, Douglas Buck, had known all along the adult entertainment venture was going to buy the adjacent building, but had failed to disclose that information to Sintra prior to Sintra's purchase of the Larned. Sintra was successful in its suit for rescission. As a result, Sintra returned the Larned to the Schoning Group and received $317,000 in damages representing the return of the purchase price.
In the fall of 1985, after numerous unsuccessful attempts to obtain financing, Sintra applied to the City for administrative relief from the fee requirement of the HPO. The City never responded to Sintra's application. In March 1986, Hamack and Wade Cole, who is also an attorney, met with the director of the City's Department of Community Development, David Moseley, in an attempt to persuade him to recommend administrative relief. During that meeting, Cole advised Moseley of a King County Superior Court decision that had invalidated HPO-I, implying the City was wrong to enforce HPO-II against Sintra. According to Cole, Moseley's response was, "So what are you going to do, sue me?" Report of Proceedings at 409.
Cole testified he responded by saying "since the case had already been in court and already been decided, it would be a fairly simple matter to obtain a copy of the summons and complaint, change the names and the dates, and refile it on behalf of Sintra and Mr. Hamack." Report of Proceedings at 409-10. Hamack was present for this remark, so the record establishes suing the City on the same premise as the successful, earlier HPO suit was something Sintra had considered. Cole, in fact, later testified it may have been Hamack who made the observation that it would have been an easy matter to obtain a ruling invalidating HPO-II.
On July 15, 1986, the King County Superior Court held HPO-II illegal, enjoining its enforcement against the plaintiff in that case. Nevertheless, the City still required Sintra to pay the $219,000 fee before it would issue a demolition permit. In April 1987, we affirmed the King County Superior Court, and the City ceased enforcing the ordinance against Sintra. San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 735 P.2d 673 (1987).

*577 ANALYSIS
A. Substantive Due Process and 42 U.S.C. § 1983
The majority upholds the trial court's decision on 42 U.S.C. § 1983 and declines to revisit our opinion in Sintra I.[2]Sintra I held an arbitrary and capricious land use decision in violation of substantive due process, standing alone, does not form the basis for a cause of action for damages under 42 U.S.C. § 1983, but permits only invalidation of the decision. Irrational or invidious conduct is necessary to prove damages. Majority op. at 562.
The trial court ruled as a matter of law the City acted arbitrarily and capriciously, violating Sintra's right to substantive due process by enforcing the HPO before July 15, 1986. The trial court denied any monetary recovery, however, because the City's conduct prior to July 15, 1986 was not invidious or irrational. The trial court submitted Sintra's claim for damages under 42 U.S.C. § 1983 to the jury for the City's post-July 15, 1986 enforcement of the HPO. The jury obviously did not think much of Sintra's § 1983 claim, awarding it a total of $3, or $1 in damages each against the City and against the two remaining individual defendants. The City does not appeal from the trial court decisions on 42 U.S.C. § 1983, although Sintra does so.
Rather cryptically, the majority suggests our prior decisions and federal analysis of substantive due process under 42 U.S.C. § 1983 have limited the availability of claims for damages under this statute. Majority op. at 562. This is an understatement. A more accurate statement is federal jurisprudence has virtually rejected the application of substantive due process to land use claims under 42 U.S.C. § 1983, requiring instead that such claims be based on a specific constitutional provision such as the takings clause of the Fifth Amendment. Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir.1996).[3] This is particularly true if a viable state remedy exists. Hayes v. City of Seattle, 131 Wash.2d 706, 934 P.2d 1179 (1997) (Talmadge, J., dissenting).[4]
The federal cases also indicate something more than a mere violation of state land use law must be present before a cause of action is stated under 42 U.S.C. § 1983 for a violation of substantive due process. "A violation of state law is not a denial of due process of law." Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 467 (7th Cir.1988)[5];
*578 "It is bedrock law in this circuit, however, that violations of state laweven where arbitrary, capricious, or undertaken in bad faithdo not, without more, give rise to a denial of substantive due process under the U.S. Constitution." Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir.1992); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3d Cir.1991), cert. denied, 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); Steuart v. Suskie, 867 F.2d 1148, 1150 (8th Cir.1989); Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104 (8th Cir.1992):
[I]n zoning and land-use disputes with local governments, the plaintiff must allege something more than that the government decision was arbitrary, capricious, or in violation of state law. Such claims, if asserted, are better addressed to state courts and administrative bodies. Otherwise, every violation of state law could be turned into a federal constitutional tort.
In Orion Corp. v. State, 109 Wash.2d 621, 652, 747 P.2d 1062 (1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988), we said the same thing: "If our state constitution provides the protection sought, a federal question under the Fourteenth Amendment's due process clause does not arise."[6]
Based on the present federal court treatment of substantive due process and 42 U.S.C. § 1983, Sintra's claim should never have reached the jury. Because a claim for damages under 42 U.S.C. § 1983 must be grounded in a specific provision of the Constitution, this case was properly tried only as a taking case under the Fifth Amendment.
B. Temporary Regulatory Taking
Challenges to federal, state, and local government restrictions on development have proliferated in recent years in both state and federal courts. The formerly well-established jurisprudence of eminent domain has been pushed into the background by claims of inverse condemnation, regulatory taking, and substantive due process, creating an utterly confusing mish mash. Recounting the history and development of temporary regulatory taking law helps inform an understanding of the present case.
1. Federal Approach
The United States Supreme Court has struggled mightily with the basis for compensation for temporary regulatory takings. Justice Brennan's dissent in San Diego Gas & Electric Co. v. City of San Diego, 450 U.S. 621, 658, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981), argued monetary loss from a temporary regulatory taking ought to be compensable under the Just Compensation clause of the Fifth Amendment. The Court so held in First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (mere invalidation of a regulation is not enough). See also Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (employing multifactor test to determine a compensable regulatory taking had not occurred), and Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (holding compensable regulatory taking had occurred *579 because of lack of "essential nexus" between regulation and asserted public interest). In Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Court further refined regulatory takings law by holding where a regulation takes all economically beneficial use of property there is a taking per se, and no balancing of interests is permitted. Most recently, in Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), the Court held there must be "rough proportionality" between the cost of the taking and the public benefit. The Court placed the burden of proving "rough proportionality" on the regulatory agency; in the absence of such "rough proportionality," the statute, regulation, or ordinance effects a taking.
2. Washington's Approach[7]
Washington's temporary regulatory taking jurisprudence starts with the analysis of the state's police power. In Conger v. Pierce County, 116 Wash. 27, 198 P. 377, 18 ALR 393 (1921), we held the police power is an inherent attribute of government and, to the extent the police power is properly exercised in furtherance of safety, morals, health, or the general welfare of the public, an action cannot be a compensable taking, even if there is damage to property.[8]See also State v. Dexter, 32 Wash.2d 551, 202 P.2d 906, 13 ALR 2d 1081 (1949).
Subsequent cases refined this approach by requiring a case-by-case analysis "balancing of the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property." Maple Leaf Investors, Inc. v. State, Department of Ecology, 88 Wash.2d 726, 731, 565 P.2d 1162 (1977). We cited in Maple Leaf to the well-known opinion in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 28 ALR 1321 (1922), where Justice Holmes wrote:
The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. Hairston v. Danville & Western Ry. Co., 208 U.S. 598, 605, 28 Sup.Ct. 331 [334], 52 L.Ed. 637, 13 Ann. Cas. 1008. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.
The general rule at least is that while property may be regulated to a certain extent [without compensating the owner], if regulation goes too far it will be recognized as a taking.
See also Kennedy v. City of Seattle, 94 Wash.2d 376, 617 P.2d 713 (1980); State ex rel. Randall v. Snohomish County, 79 Wash.2d 619, 623, 488 P.2d 511 (1971) ("Unless the controls would deprive plaintiffs of a previously existing usage right, the burden is on plaintiffs to establish the unreasonableness of an otherwise permissible legislative zoning enactment."); Granat v. Keasler, 99 Wash.2d 564, 663 P.2d 830 (1983) (ordinance limiting right of landlord to evict houseboat tenants from moorage was deprivation of property without just compensation).
The application of substantive due process principles to government regulation of land created even more doctrinal murkiness. The concept of substantive due process as a constitutional theory upon which to base challenges *580 to governmental actions first appeared in our cases with little fanfare and even less authority in Norco Constr., Inc. v. King County, 97 Wash.2d 680, 649 P.2d 103 (1982), where we suggested due process was a limiting principle for zoning ordinances. In West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 52, 720 P.2d 782 (1986), we stated "this court has often ruled that due process considerations limit how local governments use their police power," and then stated categorically: "Thus a land use ordinance satisfies due process standards only if it (1) is aimed at achieving a legitimate public purpose, and (2) uses means to achieve that purpose that are reasonably necessary and not unduly oppressive upon individuals." Id.; Goldblatt, 369 U.S. at 594-95, 82 S.Ct. at 990; Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894).[9]
In Orion Corp. v. State, 109 Wash.2d 621, 747 P.2d 1062 (1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988), this Court tried to harmonize the complex and conflicting Washington case law on takings rooted in the police power analysis and the balancing of interests. The Orion court adopted the three-part test for police power excess stated in Goldblatt for substantive due process violations in land use cases. Orion, 109 Wash.2d at 647-48, 747 P.2d 1062.
The Orion court correctly pointed out that examining an allegedly excessive regulation either as a due process violation or as an excessive use of the police power asks the same question: Is the landowner being forced to shoulder an economic burden that, "in justice and fairness," the public at large should bear? Id. at 648-49, 747 P.2d 1062. Nevertheless, Orion recognized two alternate remedies for excessive regulation: a violation of substantive due process, allowing invalidation of the regulation; or a taking, requiring just compensation. Id. at 649, 747 P.2d 1062. The Court's approach in not allowing damages for substantive due process claims was practical:
If all excessive regulations require just compensation, rather than invalidation, land-use decision makers, who adopt regulations in a good faith attempt to prevent a public harm, will nevertheless be held strictly liable for regulations that result in a taking. Undoubtedly, the specter of financial liability will intimidate legislative bodies from making the difficult, but necessary choices presented by the most sensitive environmental land-use problems.... Strict liability would not result for all excessive regulations, however, under the approach developed in our own regulatory takings jurisprudence.
Orion, 109 Wash.2d at 649, 747 P.2d 1062. See also Presbytery of Seattle v. King County, 114 Wash.2d 320, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).
But all excessive land-use regulations do require just compensation. Merely labeling the cause of action as a violation of substantive due process rather than a regulatory taking does not change the nature of the wrong, or eliminate the constitutional imperative to provide a remedy. No matter how we describe the cause of action challenging a regulation, if a regulation "goes too far," it is a taking requiring just compensation.[10] *581 I have difficulty conceiving of a situation in the context of land-use regulation where a regulation is not a taking, but is constitutionally infirm as a denial of due process. Always, the challenged regulation places some restriction on the use of property, resulting in economic deprivation. If a regulation exceeds the permissible boundaries of the police power, and thereby causes a tangible economic diminution in the value of property, then the aggrieved landowner is entitled to just compensation. If a court holds a challenged regulation to be within the permissible boundaries of the police power, on the other hand, then even though some diminution in value might have occurred, compensation is not required. Always, the central inquiry must be: does the regulation "go too far?"
We have adopted various tests for this central inquiry. For instance, in analyzing whether a taking has occurred, we first ask if the regulation "substantially advances legitimate state interests." Presbytery, 114 Wash.2d at 333, 787 P.2d 907. If it does, then we consider whether a facial or an asapplied challenge is involved. For a facial challenge, "the landowner must show that the regulation denies all economically viable use of any parcel of regulated property in order to constitute a taking." Id. at 333-34, 787 P.2d 907. For a challenge to the specific application of the regulation, the Court employs a three-part test: "(1) the economic impact of the regulation on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action." Id. at 335-36, 787 P.2d 907. The standard of review for an alleged substantive due process violation also employs a three-part test: "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner." Id. at 330, 787 P.2d 907. As inspection shows, all of these tests can be reduced to the central inquirydoes the regulation "go too far."
3. A Clearer Approach: Dolan
We began our analysis in Presbytery by equating inverse condemnation with excessive regulation. Equating these two different concepts was unfortunate, however, because doing so causes unnecessary confusion. The term "inverse condemnation" is better left to its original association as the inverse of eminent domain: "an `action brought against a governmental entity having the power of eminent domain to recover the value of property which has been appropriated in fact, but with no formal exercise of the power.' Martin v. Port of Seattle, 64 Wash.2d 309, 310 n. 1, 391 P.2d 540 (1964), cert. denied, 379 U.S. 989, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965)." Presbytery, 114 Wash.2d at 323 n. 2, 787 P.2d 907. What makes inverse condemnation inverse is that the compensation for the taking occurs after the taking, and at the instance of the property owner, who sues for the value of the taking.
Condemnation by eminent domain means an actual physical occupation or taking of property, or damage to it. Condemnation does not occur until the landowner receives compensation through the eminent domain process.
A regulatory taking is not a physical occupation of land, or damage to land, but simply a regulatory limitation of the owner's use of land.[11] Damages from a regulatory taking will almost always be in the nature of economic loss, rather than in the form of monetary loss resulting from physical occupation of or damage to land. The allegation in a regulatory taking case will be that owner's land diminished in economic value as a result of restrictions the regulation placed on its *582 use. The law should maintain a robust distinction between eminent domain and inverse condemnation on the one hand, and regulatory taking on the other.
In defining a regulatory taking, we would be wise to cut the Gordian Knot by scrapping the conflicting lines of authority and start afresh to describe when a regulatory limitation of the owner's use of land, which is not a physical occupation of the land or damage to the land, constitutes a taking. We should abandon substantive due process as an analytical tool and avoid the alternate remedies for excessive government regulation set forth in Orion and subsequent cases. We should rely instead on Dolan, which provides a workable framework for assessing an allegation of excessive regulation of land.
We have adopted the Dolan approach in two recent cases. In Trimen Dev. v. King County, 124 Wash.2d 261, 877 P.2d 187 (1994), we upheld the county's imposition of a park impact fee on a developer as being "reasonably necessary" to offset the direct detrimental results of the development, citing to Dolan's "rough proportionality" test. Id. at 274, 877 P.2d 187. Similarly, in Sparks v. Douglas County, 127 Wash.2d 901, 904 P.2d 738 (1995), where Douglas County conditioned approval of the Sparkses' short plat applications upon dedication of rights of way for road improvements, we applied a Dolan analysis, asking whether the "exactions demanded by Douglas County are roughly proportional to the impact of the Sparkses' proposed developments." Sparks, 127 Wash.2d at 915, 904 P.2d 738. We concluded they were, and reversed the Court of Appeals. Id. at 917, 904 P.2d 738.[12] The Dolan "rough proportionality" test now provides the appropriate analytical framework for deciding when a regulation "goes too far."
To prove a regulatory taking in Washington, the plaintiff must allege a lack of "rough proportionality" between the cost of the taking to the property owner and the benefit to the public. The agency has the burden of proving the existence of "rough proportionality." That is, the agency must show (1) the challenged regulation advances a legitimate state interest; (2) there is an "essential nexus" between the interest advanced and the requirement exacted, Nollan, 483 U.S. at 834, 107 S.Ct. at 3147-48; The Luxembourg Group, Inc. v. Snohomish County, 76 Wash. App. 502, 505, 887 P.2d 446, review denied, 127 Wash.2d 1005, 898 P.2d 307 (1995); (3) there is a roughly proportional relationship between the benefit to the public and the cost to the landowner; and (4) damages were proximately caused by the governmental action.
The Court in Sintra I appeared inclined to hold the demolition fee "goes too far": "The economic impact on Sintra is enormous. It was asked to pay a $219,000 fee to develop a $670,000 piece of property." Sintra, 119 Wash.2d at 22, 829 P.2d 765. Plainly, the Court could only express its shock at the size of the demolition fee. By contrast, had Dolan been available at the time of the Sintra I decision, the Court would have been able to assess whether the City had carried its burden of showing the demolition fee was "roughly proportional" to the public benefit.
In summary, Dolan provides a sturdy analytical framework for cases such as this. By placing the burden of proving "rough proportionality" on the administrative agency, Dolan protects property owners by providing quantitatively-based administrative and judicial review of land use regulations.
C. Damages for Taking
The jury returned a verdict for Sintra on its taking claim in the amount of $47,809. The City does not appeal from this judgment, although Sintra believes the award too low. In my view, Sintra was not entitled to any award for a taking as it was not the owner of the property when the Housing Preservation Ordinance was enacted. Moreover, substantial evidence did not support the damage award.
1. Ownership of Property at Time of Taking
If the Housing Preservation Ordinance effected a constitutional taking by the imposition *583 of the demolition fee, only the owner of the property when the ordinance was enacted, and not any subsequent owner, could recover for the taking. Sintra bought the Larned Hotel knowing the HPO was in place. The enactment of the HPO predated Sintra's acquisition of the Larned Hotel. Sintra's challenge to the ordinance is not that the City's particular application of it to Sintra's particular circumstances was a taking, but that the mere existence of the ordinance effected a taking. The taking Sintra alleges occurred once: "In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed." Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 688 (9th Cir.1993), cert. denied, 510 U.S. 1093, 114 S.Ct. 924, 127 L.Ed.2d 217 (1994). See also 2 JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 5.01[4], at 5-29  5-30 (Rev.3d ed. 1995); 29A C.J.S. Eminent Domain § 383, at 757 (1992).
Sintra incurred no injury entitling it to assert a facial challenge to the ordinance. "A landowner who purchased land after an alleged taking cannot avail himself of the Just Compensation Clause because he has suffered no injury. The price paid for the property presumably reflected the market value of the property minus the interests taken." Carson Harbor Village Ltd. v. City of Carson, 37 F.3d 468, 476 (9th Cir.1994). Accord, Garneau v. City of Seattle, 897 F.Supp. 1318, 1324-25 (W.D.Wash.1995). See also Danforth v. United States, 308 U.S. 271, 283, 60 S.Ct. 231, 235-36, 84 L.Ed. 240 (1939). Washington law is the same. Kakeldy v. Columbia & P.S.R. Co., 37 Wash. 675, 680, 80 P. 205 (1905); Hoover v. Pierce County, 79 Wash.App. 427, 433-34, 903 P.2d 464 (1995), review denied, 129 Wash.2d 1007, 917 P.2d 129 (1996); State v. Sherrill, 13 Wash.App. 250, 258 n. 1, 534 P.2d 598, review denied, 86 Wash.2d 1002 (1975).
If any compensable taking of the Larned property occurred, it occurred on the day the HPO was enacted. At that point, the demolition fee requirement went into effect, diminishing the value of the property. Anyone wishing to buy and develop the Larned property by demolishing the buildingthereby lessening the number of housing units in the citywould have had to pay a demolition fee. The requirement for payment of the demolition fee would presumably reduce the value of the land by the amount of the fee the purchasing developer would have to pay. If the Schoning group could have shown the HPO "went too far," the enactment of the HPO would be a taking, and the Schoning group would have had a cause of action for just compensation. Petersen v. Port of Seattle, 94 Wash.2d 479, 485, 618 P.2d 67 (1980).
In the present case, Sintra not only knew about the HPO before it purchased the Larned, it negotiated with the seller to make the sellers' notice to Sintra of the HPO a private agreement not set forth in the purchase and sale agreement. Sintra also knew the City had turned down the sellers' request for a variance from the HPO requirements. Moreover, Sintra called the HPO enforcement office before the purchase to ascertain the HPO would place no requirements on Sintra's plan for a bed and breakfast.
In summary, Sintra purchased the Larned with full knowledge of the HPO. If the HPO effected a taking of the Larned property, the taking occurred before Sintra purchased the property. The right to damages does not run with the property. Sintra, therefore, did not have a regulatory taking claim.
2. Substantial Evidence Does Not Support the Verdict
Despite Sintra's efforts to show how wrong the City was to enforce the HPO after July 15, 1986, the jury found Sintra had suffered no damages from the City's enforcement. The trial court instructed the jury in no uncertain terms as to the illegality of the City's enforcement of the HPO after the King County Superior Court had found the ordinance illegal:
A city and its employees cannot lawfully enforce provisions of a facially invalid ordinance against any person or corporation. Each aggrieved person need not bring his own action challenging the ordinance. A *584 declaratory judgment rendered by the Superior Court in one case finding an ordinance invalid is binding on the city and its employees in every case or situation.
Clerk's Papers at 273. The court further instructed the jury "You are instructed that it has previously been adjudged that the defendants did, acting under color of state law, arbitrarily and irrationally deprive plaintiffs of their constitutional rights by the continued enforcement of the Housing Preservation Ordinance after the date of July 15, 1986." Clerk's Papers at 274. What was left for the jury to decide was whether these unlawful acts of the City were a proximate cause of the damage to Sintra. Id.
The jury rejected Sintra's damage claim. It found the City's conduct in enforcing the HPO against Sintra after July 15, 1986, was not a proximate cause of injury to Sintra. In other words, the jury believed even if the City had ceased enforcing the HPO after July 15, 1986, Sintra would still have derived no economic benefit from the Larned property. The jury plainly believed the City's argument the Larned development was economically untenable regardless of the HPO. Pursuant to the court's direction, however, it awarded Sintra nominal damages of $3.
Yet, the jury did find a regulatory taking and awarded $47,809 as compensation to Sintra. This decision by the jury is most puzzling and is not supported by substantial evidence. Sintra argues the taking began on the date it applied for a permit, October 29, 1985. The jury mistakenly assumed the property could have produced income between October 29, 1985, and July 15, 1986. The record does not support this view.
Even if the City had granted Sintra the permit without requiring the demolition fee as early as the date of application, Sintra still would have had to arrange for financing, hire a contractor, and build the mini-storage warehouse before any revenues comprising the leasehold value of the property could be realized. Hamack and Sintra's consultant testified it would have taken six months after receiving a permit for the mini-storage to begin operations. Thus, the absence of revenues from the leasehold value of the property between the time Sintra applied for the permit and July 15, 1986 could not have come from any taking, but instead from the normal delay that would have occurred in financing and constructing the mini-storage warehouse.[13] Nevertheless, the City did not assign error to the jury's finding of a taking and the award of compensation.
The trial court instructed the jury to calculate the leasehold value as Sintra's damages in instruction 14:
If a temporary taking has been proven, the measure of compensation to which plaintiff Sintra is entitled is the leasehold value of the property for the period during which the Housing Preservation Ordinance was enforced against the plaintiffs. Such amount should be calculated assuming the highest and best use for the property, which means that use which will bring the greatest economic return over a given time.
Clerk's Papers at 280. No definition of "leasehold value" was provided. The jury sought guidance from the court, inquiring first whether the word "should" in the last sentence of Instruction No. 14 means "must." The court responded enigmatically: "The last paragraph of Instruction No. 14 concerns the proper method for calculating `just compensation' in the event that you have found a taking to have occurred." Clerk's Papers at 284. The court's answer was not responsive to the jury's question.
A few minutes later, the jury inquired, "Does leasehold value represent gross income or net income after expenses?" This was a sensible question. The court answered, incorrectly, "Leasehold value means the market rental rate for the building during such period as you find a taking to have occurred." Clerk's Papers at 283. The *585 court did not define "market rental rate" to the jury. The court explained its view of the meaning of leasehold value after the trial: "[Just compensation] would be limited to the leasehold value of the building in question to a willing lessor [the court probably meant lessee here] of the entire building. That would be in distinction from the gross rental receipts from someone who might be renting storage units in a building which had already been converted to that particular use." Report of Proceedings, July 1, 1994, at 7-8.
Apparently, then, in response to the jury's inquiry, when the court said just compensation is the "market rental value" of the building, it meant the rate at which Sintra would agree to lease the entire building to a willing lessee. If this was the court's view of the law, the court should have told the jury as much in an appropriate jury instruction. Perhaps the court did not do so because neither side presented any evidence of what the value of the building would have been to a willing lessee.
Partial evidence from Sintra's own expert witness was that just compensation for the alleged temporary taking was net operating income, i.e., total rental revenue less total costs. Exs. 306, 307. But see n. 13, infra. According to juror Slater, the jury settled on the net operating income figure Sintra's expert had provided, so the court's response apparently did no harm. Clerk's Papers at 392.[14]
Nonetheless, the principal amount of damages adopted by the jury is manifestly incorrect. The figure the jury used represented four months of net operating income as projected by Sintra's economist. The net operating income calculation was found in Ex. 306, entitled "Temporary Taking Damages," which purports to show "the loss of net operating income over the period from November, 1985 through June, 1987, based on an [annual] income-producing potential of the completed project of $143,428." Id. This figure assumes 90 percent occupancy, a level Sintra's economist did not expect the mini-storage warehouse to achieve until the third complete year of operation. Ex. 307. In the first year of operation, Sintra's economist predicted only 50 percent occupancy and annual net operating income of $55,900. Id. This means four months of net operating income for the first year of operationa time period between July 15, 1986, and June 1987would be $18,633, considerably less than the $47,809 the jury found.
Even more erroneous, however, was the court's failure to subtract other factors from net operating income to obtain the true leasehold value. For instance, the City's expert, William Partin, testified it was necessary to deduct debt service from net operating income to reach the true profit or loss determination:
If this project had been built, it would have had to have had, by definition, debt service associated with it. As so, if you are going to measure the profits that were lost, that is you would have to take Mr. Moss's [Sintra's economist's] net operating number, I believe he used $11,952 per month, and then you deduct from that the debt service to find out how much cash you would have in your pocket as an owner each month if this were a viable project.
Report of Proceedings at 2220. Sintra's economist assumed debt service to be $103,102 annually. Ex. 307.[15] Partin calculated this to equal $8,592 per month. Subtracting that number from the projected net operating income leaves $3,360 per month as actual profit. Thus, using Sintra's economist's figures, *586 and taking debt service into account, the principal amount could not have exceeded 4 times $3,360, or $13,440, for the four-month taking period.
But even this number would be wrong. As noted above, Sintra's economist told the jury the project would have been at only 50 percent occupancy during the first year of operation. Ex. 307. Thus, the projected net operating income of $55,900 for the first year of operation, from which the yearly debt service, $103,102, must be subtracted, produces a negative cash flow for the first year of operations of $47,202. Id. Because the taking could not have begun before July 1986, and because it ended in April 1987, the pertinent period for the taking must have been during the first year of projected operations, a time when the low start-up occupancy rate would have resulted in negative cash flow.
Plainly, the Housing Preservation Ordinance requirements did not cause Sintra's problems. The appearance of the adult entertainment facility caused Sintra to change its plans to build a bed and breakfast and caused Sintra's loss, as Sintra itself argued to the trial court. Clerk's Papers at 11. A bed and breakfast would not have required any demolition fee under the HPO. Thus, Sintra bought the Larned property knowing of the HPO requirements, and was forced to comply with them only when its plans for the Larned changed. Had Sintra known of the prospective adult entertainment facility, perhaps it would not have elected to purchase the Larned with the expectation of converting it to a bed and breakfast. That lack of knowledge is precisely why Sintra sued the Schoning group, which did know about the prospective adult entertainment facility but said nothing to Sintra. Sintra recovered $317,000 from the Schoning group in settlement after winning at trial. Although Sintra obviously did not take into consideration the possibility of an adult entertainment facility immediately adjacent to its planned bed and breakfast, such economic misfortunes are what the United States Supreme Court has referred to as one of the "incidents of ownership." Danforth v. United States, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939). While I do not condone the City's improper enforcement of the HPO after two King County Superior Court decisions declaring the ordinance illegal, this particular plaintiff did not suffer any harm.
D. Interest and Attorney Fees
Even if the majority were correct in its analysis of Sintra's claims under 42 U.S.C. § 1983 and regulatory takings, its treatment of the trial court's decisions on interest and attorney fees is flawed.
1. Interest
The trial court based its compound interest award of $60,918.73 on the jury's award of $47,809 in damages for the first four months after July 15, 1986. The trial court held the taking ended in April 1987, on the date the Supreme Court upheld the King County Superior Court's invalidation of HPO-II. It then calculated compound interest at 12 percent on the principal amount of $47,809 from that date until the date of judgment.[16] Plainly, because the principal amount is incorrect, the interest calculation must also be erroneous. Nevertheless, I agree with the majority's conclusion that only simple interest is allowable. Sintra did not prove, or even attempt to prove, simple interest did not provide it with just compensation.[17] There *587 must be a presentation of evidence, and, in a case such as this, where the trial judge was the finder of fact as to the proper rate of interest necessary to provide just compensation, the trial judge must enter findings of fact and conclusions of law to support the interest award. See State v. Doyle, 735 P.2d 733, 742 n. 15 (Alaska 1987) (affirming trial court's denial of compound prejudgment interest because there was no showing compound interest was necessary to provide just compensation). Moreover, the standard of proof should have been beyond a reasonable doubt that the interest statute, RCW 19.52.020, was unconstitutional as applied to Sintra.[18]
2. Attorney Fees
a. 42 U.S.C. § 1988
I agree with the majority's conclusion Sintra is not entitled to attorney's fees for the alleged civil rights violations.
b. RCW 8.25.075
Under RCW 8.25.075, the statute pertaining to awards of attorney fees in all eminent domain proceedings, a condemnee is entitled to fees only if the condemnor makes a "written offer in settlement" and the award secured by the condemnee at trial exceeds the offer by 10 percent. RCW 8.25.075(3). It is not clear initially, given the trial court's erroneous calculation of interest, whether the statutory test of RCW 8.25.075(3) has been met.
RCW 8.25.075(3) is silent on the question of whether interest is part of the award for purposes of the statutory offer. The statute says only reasonable attorney fees and reasonable expert witness fees may be allowed, "but only if the judgment awarded to the plaintiff as a result of trial exceeds by ten percent or more the highest written offer of settlement submitted by the acquiring agency to the plaintiff." (Emphasis added). In my view, the interest awarded in this case came not as a result of trial, but as a result of the statutory mandate for the award of interest in Title 8 cases. RCW 8.28.040. In Northside Auto Serv., Inc. v. Consumers United Ins. Co., 25 Wash.App. 486, 607 P.2d 890 (1980), the plaintiff made an offer of settlement of "$973.50 together with interest thereon," under RCW 4.84.250, which at that time allowed attorney fees in cases where the plaintiff sought damages and the amount pleaded was $1,000 or less, "exclusive of costs." The Court of Appeals held the statute applied, excluding interest from the calculation of the amount pleaded. The Northside Auto approach is correct and applicable here. Interest should not be calculated as part of Sintra's award for purposes of RCW 8.25.075(3). Thus, because Sintra's recovery did not exceed the $75,000 offer from the City, Sintra is not entitled to attorney fees.
c. Hourly Rate
The City challenged the trial court's assigning $225 as the hourly rate for Sintra's lead counsel to be used to calculate attorney's fees. Sintra's lead counsel submitted a declaration asking for an hourly rate of $250, even though he stated in his declaration his usual hourly rate during the pendency of the case was $150. The declaration sought to justify the higher hourly rate by comparison with other attorneys of like experience doing similar work. Under a fee shifting statute, *588 rule, contract, or equitable theory, an attorney is ordinarily entitled to recover only the reasonable fees actually charged to the client, not the fees the attorney wishes he or she might have charged. Scott Fetzer Co. v. Weeks, 122 Wash.2d 141, 149-50, 859 P.2d 1210 (1993). The trial court abused its discretion by not adopting $150 as the lodestar hourly rate and then justifying departure from it by analyzing the factors set forth in Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 675 P.2d 193 (1983); Travis v. Washington Horse Breeders Ass'n, 111 Wash.2d 396, 411-12, 759 P.2d 418 (1988) (limited availability of multipliers under Washington law).

CONCLUSION
Washington's law on recovery for excessive governmental regulation of property deserves a clearer analytical framework than the majority provides. In general, whether described as a violation of the landowner's right to substantive due process of law, and consequently a violation of 42 U.S.C. § 1983, or a temporary regulatory taking, we should scrap prior formulations and ground any recovery in the Fifth Amendment takings analysis of the United States Supreme Court in Dolan.
In this case, Sintra was not entitled to recover any damages, even under the theories for recovery articulated by the majority. Sintra's purchase of the property at issue postdated enactment of the HPO; any taking of Sintra's property had already occurred. Further, the record indicates Sintra did not suffer a loss as a result of City action. Unfortunately, the City did not seek relief on appeal from the erroneous damage award.
Sintra was not entitled to an award of attorney fees under RCW 8.25.075 or 42 U.S.C. § 1988. I would remand the case to the trial court for a proper calculation of interest on a recovery of $47,812.
NOTES
[1] Sintra's shareholders are Plaintiffs Keith and Patty Hamack and Arthur and Susan Stanley.
[2] The Ordinance provided, in part: "The Director may provide full or partial relief from the housing replacement requirement, if the owner establishes with clear and convincing proof that:

1. The literal interpretation and strict application of the housing replacement requirement of this Ordinance would prevent the owner from making profitable use of the property. `Profitable use of the property' shall not be the highest, best, or expectant use of the property but any use which may lawfully and reasonably develop the property...." Seattle City Ordinance 112342, § 13.
[3] In a typical letter to the City, Sintra wrote: "[W]e are financially drained and are incurring an additional debt of over $6,000.00 per month. Our position is extremely precarious and each additional day of delay is an additional missed remaining opportunity to avoid financial disaster for our two families." Pls.' Ex. 227.
[4] The trial court dismissed all claims against the individual Defendants for actions taken prior to July 15, 1986 on the basis of qualified immunity. It granted summary judgment in favor of Sintra and against Defendants Holly Miller and Ovid Thompson for violation of 42 U.S.C. § 1983 after July 15, 1986.
[5] Specifically, Sintra argued the jury had underestimated the period of the taking: "Correcting the verdict to the beginning and end of the taking is nothing more than a mathematical calculation....

"The jury accepted Moss's testimony as Sintra's recovery for the highest and best use as $11,952 per month.... For the entire period this yields compensation of $239,047." Clerk's Papers at 295.
[6] Sintra has not assigned error to the trial court's ruling that the City did not act irrationally as a matter of law before July 15, 1986.
[7] Sintra I cited R/L Assocs. and Silverman v. Barry, 845 F.2d 1072 (D.C.Cir.1988). See Sintra I, 119 Wash.2d at 23, 829 P.2d 765. R/L Assocs. relied on Harding v. County of Door, 870 F.2d 430 (7th Cir.1989), and Coniston Corp. v. Hoffman Estates, 844 F.2d 461 (7th Cir.1988). See R/L Assocs., 113 Wash.2d at 412, 780 P.2d 838. At issue in these federal cases was whether local government decisions to withhold building permits were arbitrary and capricious such that plaintiffs were deprived of substantive due process.
[8] Clerk's Papers at 11.
[9] Under this procedure, the State takes immediate possession of the owner's property with estimated just compensation placed in the court registry until actual compensation is ascertained by a jury. See RCW 8.04.090, .092.
[10] Sintra also offered an instruction telling the jury to award 12 percent interest.
[11] The colloquy went as follows:

"[Sintra] My instruction No. 67 related to interest on a prejudgment interest particularly on takings. I understand that the Court is going to add premium interest on the takings award.
"MS. WAGNER [the City]: Your Honor, that's not correct. We haven't made any decision on that.
"THE COURT: The Court has indicated that it would be addressed as a post-trial matter.
"MS. WAGNER: But the question as to whether it may be added would be dependent on other matters.
"THE COURT: It will be fully addressed at a post-trial matter if appropriate.
"MR. SANDER[S] [Sintra]: In any event, there are two ways to do this; either the Court could do it or the jury could do it. But, we have a right to interest one way or another, and I want to make sure that my position is clear on that.
"THE COURT: Yes, it is." Report of Proceedings, vol. 14 at 2376-77.
[12] Although there was no waiver under CR 38 or CR 39, the special verdict form read in conjunction with the jury instructions omitted interest, which would allow the judge to decide the issue under CR 49(a).
[13] Here, Sintra presented different calculations of interest to the trial court, both simple and compound, based on the leasehold value of the land from the date of the taking. No evidence was offered that would go to prove the fact that simple interest at 12 percent per annum would not afford Sintra just compensation.
[14] Haslip was a due process challenge to punitive damages. The Court looked at the following factors in determining whether the award comported with due process: (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. See Haslip, 499 U.S. at 21-22, 111 S.Ct. at 1045-46
[15] The City made a CR 68 "offer of judgment" dated May 27, 1993 for $75,000 "plus plaintiffs' costs and attorney's fees" for the period prior to the offer. Clerk's Papers at 304.
[16] A prevailing party in a § 1983 action may recover attorney's fees as part of costs under 42 U.S.C. § 1988. But if the defendant makes an offer of judgment and the plaintiff does not obtain a judgment more favorable than the offer, the defendant is not liable for attorney's fees incurred after the settlement offer. See Marek v. Chesny, 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). Fed.R.Civ.P. 68 and CR 68 are identical as far as this issue is concerned. See Hodge v. Development Servs., 65 Wash.App. 576, 579, 828 P.2d 1175 (1992).
[17] The trial court properly determined that April 1987 through July 22, 1994 is the time period for which interest as part of just compensation is required. We note that even with the required change from compound to simple interest, the final judgment exceeds the City's offer of $75,000 by more than 10 percent, qualifying Sintra for attorney's fees under RCW 8.25.075. (($47,809 × 12%) × (approximately) 7 years = $40,159.56. $47,809 + $40,159.56 = $87,968.56. The City's offer plus 10 percent is $82,500.)
[18] In Sintra I, we termed this case a "strictly economic case." Sintra I, 119 Wash.2d at 22, 829 P.2d 765.
[19] The court also stated the takings claim comprised 35 percent of the case and the intentional interference with a business expectancy claim represented the remaining 5 percent. Clerk's Papers at 770.
[1] Applying its new test, the Dolan Court reversed the state courts and held that (1) the City's interest in flood control did not justify a pedestrian easement across the owner's property, and (2) the City had not met its burden to show that the additional traffic impact of the proposed project was reasonably related to the need for a new bicycle path. Dolan, 512 U.S. at 391-93, 114 S.Ct. at 2320-22.
[2] This assumption was limited by the additional assumption that such a restriction would not "interfere so drastically with the [owners'] use of their property as to constitute a taking." Nollan, 483 U.S. at 836, 107 S.Ct. at 3148 (citing Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 127, 98 S.Ct. 2646, 2660-61, 57 L.Ed.2d 631 (1978)). Furthermore,

[i]f the [owners] were being singled out to bear the burden of California's attempt to remedy [the cumulative impact of beach development], although they had not contributed to it more than other coastal landowners, the State's action, even if otherwise valid, might violate either the incorporated Takings Clause or the Equal Protection Clause. One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."
Nollan, 483 U.S. at 836 n. 4, 107 S.Ct. at 3148 n. 4 (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).
[3] "Undoubtedly, the prevention of flooding along Fanno Creek and the reduction of traffic congestion in the Central Business District qualify as the type of legitimate public purposes we have upheld." Dolan, 512 U.S. at 387, 114 S.Ct. at 2317-18 (citing Agins v. Tiburon, 447 U.S. 255, 260-62, 100 S.Ct. 2138, 2141-42, 65 L.Ed.2d 106 (1980)).
[4] In Nollan, the assumption that the public interest in access to the beach would justify a denial of the building permit was never tested because the Court's determination that the required "nexus" was lacking made such an inquiry unnecessary. Nollan, 483 U.S. at 838, 107 S.Ct. at 3149. In Dolan and Sparks, the threshold assumptionsthat the impacts of the proposed develop would support a denial of the proposed land use without effecting a regulatory takingwere not seriously contested.
[5] The [HPO] required the improper additional step of providing new housing. Moreover, this burden was unfairly allocated to individual property owners, rather than equally distributed among all citizens....

. . . .
Sintra's property cannot be singled out as contributing to the problem of homelessness in any pronounced way; the lack of low income housing was brought about by a great number of economic and social causes which cannot be attributed to an individual parcel of property.
Sintra I, 119 Wash.2d at 15-16, 22, 829 P.2d 765. See also Robinson v. City of Seattle, 119 Wash.2d 34, 52-53, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 24-25, 735 P.2d 673 (1987).
[6] A fourth element of Justice Talmadge's new test asks whether damages were proximately caused by the regulation. Concurrence/Dissent at 582.
[7] Dolan, 512 U.S. at 392, 114 S.Ct. at 2320. See Daniel A. Crane, Comment, A Poor Relation? Regulatory Takings After Dolan v. City of Tigard, 63 U. Chi. L.Rev. 199 (1996).
[1] Sintra bought the Larned Hotel when HPO-I was in place. HPO-II replaced HPO-I in August 1985, approximately one year after Sintra's purchase. The ordinances were identical in requiring developers to obtain a housing demolition license before proceeding with any demolition of housing units. Both ordinances gave developers the option of either providing replacement housing or paying a demolition fee. Br. of Resp'ts at 9 (San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 735 P.2d 673 (1987)).
[2] I agree with the majority's analysis of the qualified immunity of the individual defendants and its discussion of the instruction on punitive damages.
[3] Based on the same reasoning and authority as Armendariz, the Court of Appeals for the Seventh Circuit in Kernats v. O'Sullivan, 35 F.3d 1171 (7th Cir.1994), and the Court of Appeals for the Eleventh Circuit in Tinney v. Shores, 77 F.3d 378 (11th Cir.1996), have held the Fourth Amendment preempts substantive due process claims.
[4] The federal circuit courts of appeal employ various exceedingly restrictive tests for finding substantive due process, thereby reflecting their oft-stated aversion to sitting as federal zoning boards of appeal. Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir.1995) (due process clause does not function as a general overseer of arbitrariness in state and local land-use decisions). Some courts look only for a "rational basis" behind the decision, a very relaxed standard of review. Hoffman v. City of Warwick, 909 F.2d 608, 618 (1st Cir.1990). Others hold only decisions that "shock the conscience" are worthy of constitutional protection. Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 943 (D.C.Cir.1988). Others look for decisions animated by bad faith, bias, or improper motive. Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir.1991), cert. denied, 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992). The Court of Appeals for the Fifth Circuit treats all land use decisions, even those Washington would characterize as quasi-judicial, as legislative acts, requiring only the least judicial scrutiny. Shelton v. City of College Station, 780 F.2d 475, 479-83 (5th Cir.), cert. denied, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 and 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986). Other courts hold that substantive due process protection applies only to fundamental rights, such as marriage and family privacy, and not to land use decisions. Halverson v. Skagit County, 42 F.3d 1257 (9th Cir. 1994).
[5] The same court forcefully reiterated this statement three years later:

The Constitution does not insist that a local government be right; whether its acts were proper in light of its concerns are staples of litigation under state law and inverse condemnation, and we reiterate the message of River Park [Inc. v. Highland Park, 23 F.3d 164 (7th Cir.1994)], Coniston [Corp. v. Village of Hoffman Estates, 844 F.2d 461 (7th Cir.(1988) and many other cases that developers cannot move land-use disputes to federal court by crying "substantive due process." That doctrine is not "a blanket protection against unjustifiable interferences with property. That way Lochner [v. People of State of New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)] lies." Schroeder [v. City of Chicago ], 927 F.2d [957, 961 (7th Cir.1991)].
Gosnell v. City of Troy, 59 F.3d 654, 658 (7th Cir.1995) (Easterbrook, J.).
[6] Sintra had the remedy of filing for a temporary restraining order enjoining the City from enforcing the HPO against it after July 15, 1986. In R/L Assocs. v. City of Seattle, 113 Wash.2d 402, 411, 780 P.2d 838 (1989), we affirmed the King County Superior Court's judgment of contempt against the City of Seattle for continued enforcement of HPO-I after the King County Superior Court had invalidated the ordinance. Sintra did not pursue this remedy. I note without analysis the City might have been able to raise the defense of failure to mitigate damages as a result of Sintra's unwillingness to seek an injunction against the City after July 15, 1986. Certainly Sintra's failure to seek an injunction brings into question the financial viability of the business opportunity Sintra claims to have lost as a result of the City's enforcement of HPO-II.
[7] Our own constitutional counterpart to the Fifth Amendment and the Fourteenth Amendment is WASH. CONST., art. I, § 3. We are not confronted here with an analysis based on it, so our decision is ultimately based on federal constitutional principles. City of Spokane v. Douglass, 115 Wash.2d 171, 176, 795 P.2d 693 (1990).
[8] "The term `police power' connotes the timetested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard of `reasonableness,' this Court has generally refrained from announcing any specific criteria." Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). "It is easy to understand the principles upon which the police power doctrine is based, but difficult to define in language its limitations." Conger, 116 Wash. at 35, 198 P. 377.
[9] This test for excessive land use regulation overruled sub silentio strongly-worded prior opinions to the contrary on the question of substantive due process. In Aetna Life Ins. Co. v. Washington Life and Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 520 P.2d 162 (1974), after reviewing the history of substantive due process cases in the United States Supreme Court, we said:

This unfortunate history of the due process clause in the United States Supreme Court presents to this court a sobering lesson in the necessity for judicial deference to the legislature in the exercise of its police power to accomplish economic regulation.
Were we to accept appellants' invitation to void the act here on substantive due process grounds, we would set a precedent for embarking upon a course already traveled and finally rejected by the United States Supreme Court.
Id. at 534, 520 P.2d 162 (rejecting challenge to constitutionality of Washington Life and Disability Insurance Guaranty Act, RCW 48.32A). See also Farrell v. City of Seattle, 75 Wash.2d 540, 542-43, 452 P.2d 965 (1969) (courts will not review zoning decisions except for manifest abuse of discretion involving arbitrary and capricious conduct).
[10] The Orion court overlooked First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), which overruled prior federal law limiting the remedy for regulatory takings to invalidation of the challenged ordinance, and permitted for the first time compensation for regulatory takings.
[11] The inadequacy of describing regulatory takings as inverse condemnations is clear given the usual definition of inverse condemnation"government actions [that] inadvertently or presumptuously usurp property interests that should have been properly acquired," Richard L. Settle, Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't, 12 U. PUGET SOUND L. REV. 339, 344 (1989). Here, Sintra complained not about the taking of its land, but about the imposition of a demolition fee of $219,000.
[12] The three dissenters in Sparks agreed with the Court's use of the Dolan test, but simply reached the opposite result based on their interpretation of the facts. Sparks, 127 Wash.2d at 917, 904 P.2d 738 (Alexander, J., dissenting).
[13] Sintra obtained a declaration from one of the jurors, who averred the jury found a taking by the City commencing on July 15, 1986, and continuing for four months. This declaration indicates the unfortunate confusion in the jury room. See Clerk's Papers at 282 (jury note requesting definition of "governmental taking"). The finding of the need for compensation of $47,809 after July 15, 1986, is completely inconsistent with the jury's finding that nothing the City did after that date was a proximate cause of injury to Sintra for purposes of 42 U.S.C. § 1983.
[14] The trial court gave no credence to the juror affidavit because it went to the deliberative processes of the jury, which inhered in the verdict.
[15] Sintra's economist Moss testified as follows with respect to the debt service:

[F]or the mature project, the fully occupied project from 1989 onward, the net operating income is in the $140,000 a year range....
Now, it would be lovely if we could stop there, but we can't, because there is going to bethe major draining factor on your operating cash is going to be the debt service you have to pay on your refinancing.... We have to deduct from this net operating income the annual debt service ... the result of that is, in the first yearand this is not at all unusualin the first year we have a net operating loss.
Report of Proceedings at 1571. This uncontroverted testimony shows it was error to allow the jury to use any calculation of just compensation that did not include a subtraction for debt service.
[16] The trial court entered no findings of fact or conclusions of law to support its oral opinion on the proper interest rate. In its oral decision on interest, the court said only with regard to the rate and its decision to compound the interest: "interest should accrue at the statutory rate from the date of April of 1987 through today. I do believe it is appropriate to have that interest compounded, again in order to achieve full and fair compensation of the claimants." The court did not allude to what evidence it relied on to find the statutory rate appropriate, or what evidence it relied on to conclude compounding interest was necessary for full and fair compensation. Report of Proceedings, July 22, 1994, at 5. In the absence of findings of fact and conclusions of law, this Court cannot know if substantial evidence supports the trial court's interest award.
[17] Washington law on interest is unambiguous. Compound interest is never implied, and may be permitted only if there is express language in a statute or agreement providing for compound interest. Goodwin v. Northwestern Mut. Life Ins. Co., 196 Wash. 391, 83 P.2d 231 (1938); Caruso v. Local Union No. 690, Int'l Bhd. of Teamsters, 50 Wash.App. 688, 689, 749 P.2d 1304 (1988). All judgments under RCW 4.56.110 and RCW 19.52.020 accrue simple interest, Caruso, 50 Wash.App. at 689, 749 P.2d 1304; even prejudgment interest awards are governed by these existing statutory provisions. Thomas v. Ruddell Lease-Sales, Inc., 43 Wash.App. 208, 216-17, 716 P.2d 911 (1986). Compound interest is simply not favored under Washington law. Goodwin v. Northwestern Mut. Life Ins. Co., 196 Wash. 391, 401-02, 83 P.2d 231 (1938); Xebek, Inc. v. Nickum & Spaulding Assocs., Inc., 43 Wash.App. 740, 743, 718 P.2d 851 (1986).
[18] "Statutes are presumed to be constitutional (In re Welfare of Harbert, 85 Wash.2d 719, 538 P.2d 1212 (1975)); the party challenging the statute has the burden of proving unconstitutionality (Higher Educ. Assistance Auth. v. Graham, 84 Wash.2d 813, 529 P.2d 1051 (1974)); and the challenging party must prove the statute is unconstitutional beyond a reasonable doubt. Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 520 P.2d 162 (1974); Hoppe v. State, 78 Wash.2d 164, 469 P.2d 909 (1970)." Sator v. Department of Revenue, 89 Wash.2d 338, 346, 572 P.2d 1094 (1977).