94 P.3d 390 (2004)
122 Wash.App. 533
Nancy HOGAN, a single person, Appellant,
v.
SACRED HEART MEDICAL CENTER, a Washington Corporation, and John and Jane Does A-F, Respondents.
No. 21691-8-III.
Court of Appeals of Washington, Division 3, Panel Five.
July 15, 2004.
*391 Mark D. Kamitomo, Shane D. McFetridge, The Markham Group Inc. PS, Spokane, WA, Richard P. Guy, Honolulu, HI, for Appellant.
Gregory J. Arpin, Gerald Kobluk, Paine, Hamblen, Coffin, Brooke, Miller LLP, Spokane, WA, for Respondents.
KURTZ, J.
The release of a solvent agent as a result of a settlement extinguishes the principal's vicarious liability. Glover v. Tacoma Gen. Hosp., 98 Wash.2d 708, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988). In the previous appeal of this case, we remanded with instructions to the trial court to hold a solvency hearing in connection with Nancy Hogan's settlement with Dr. Stuart Fealk and Physicians Anesthesia Group, P.S. On remand, the trial court concluded that because Dr. Fealk and the anesthesia group were solvent as to their proportionate share of Ms. Hogan's damages, she released Sacred Heart from its vicarious liability for Dr. Fealk's negligence. Ms. Hogan appeals. On appeal, Ms. Hogan argues that this court erred in the first appeal of this case in two important ways. First, the court reasoned that the group was an agent of Sacred Heart for the purposes of the solvency analysis. Second, in determining solvency, the court measured Dr. Fealk's and the group's assets against 60 percent as opposed to 100 percent of Ms. Hogan's damages. We conclude the holding of the first appeal is neither erroneous nor unjust, and we, therefore, affirm the judgment of the trial court.

FACTS[1]
Nancy Hogan underwent surgery at Sacred Heart Medical Center in Spokane, Washington, to repair a torn rotator cuff. Because general anesthesia sometimes produces *392 nausea, Ms. Hogan was scheduled to receive an interscalene block, which minimizes postoperative pain and nausea.
Beth Naser, a certified registered nurse anesthetist employed by Sacred Heart, administered the general anesthesia. Dr. Fealk, an anesthesiologist employed by Physicians Anesthesia Group, P.S., administered the interscalene block. The Physician's Group had an agreement with Sacred Heart under which the group's anesthesiologists provided services to the hospital as independent contractors.
The interscalene block was administered postoperatively while Ms. Hogan was still under the effects of the general anesthesia. The block was to be injected between the scalene muscles. However, Dr. Fealk mistakenly placed the needle into Ms. Hogan's spinal cord. Ms. Hogan immediately experienced pain, weakness and sensory deficits in her upper body. Shortly thereafter, she was diagnosed as suffering from degeneration of her spinal cord. Ms. Hogan was not able to keep her job as a registered nurse, suffered memory loss and lost the use of her right arm and hand. Eventually, Ms. Hogan's right arm had to be amputated.
In 1995, Ms. Hogan settled with Dr. Fealk for his insurance policy limits of $2 million, releasing him and his group from further liability. At that time, Ms. Hogan had not considered the potential liability of the hospital. She believed the settlement would adequately compensate her. However, Ms. Hogan's condition worsened. The atrophy of her spinal cord did not repair itself, but instead it grew so extensive that it threatened to consume the entire thickness of the spinal column, which would render her a quadriplegic, dependent upon a ventilator.
Ms. Hogan filed suit against Sacred Heart. The alleged liability of the hospital was based upon the acts of its employee, Ms. Naser, its failure to prevent the injury to Ms. Hogan, and lack of informed consent. The complaint did not allege that the hospital was vicariously liable as principal for the acts of Dr. Fealk as its agent. However, shortly before trial, it became evident that Ms. Hogan intended to pursue a claim based upon the hospital's vicarious liability for the acts of the anesthesiologist. It also became apparent that the hospital would defend this claim by arguing that it was released from its liability as principal from Ms. Hogan's settlement with Dr. Fealk. Before trial, Ms. Hogan asked the court to rule that the release of Dr. Fealk did not release Sacred Heart from vicarious liability for his conduct because the settlement was for policy limits and the damages exceeded that amount. Additionally, she asked the court to rule that Sacred Heart had waived any issue of release by failing to plead it.
Sacred Heart objected that Ms. Hogan had not pleaded the issue of Dr. Fealk's agency. Therefore, the hospital argued that it had no reason to plead release as an affirmative defense. The hospital also noted that in her answer to interrogatories, Ms. Hogan had not identified the hospital's vicarious liability for the acts of Dr. Fealk as one of its claims against Sacred Heart. Finally, the hospital stated that Ms. Hogan's motion was premature because it had not yet been established that Dr. Fealk was an agent of Sacred Heart.
Over Sacred Heart's objections, the trial court concluded that, based on the fact that Dr. Fealk had settled for policy limits which Ms. Hogan's alleged damages far exceeded, Ms. Hogan would be allowed to address the issue of Dr. Fealk's agency in her opening statement. The court further stated that the remaining issues would be a matter for "legal argument at the appropriate point in time."
The jury returned a special verdict form, in which it found that (1) Dr. Fealk was the apparent agent of Sacred Heart; (2) Both Dr. Fealk and Sacred Heart through Beth Naser were negligent; (3) Both Dr. Fealk's and Sacred Heart's negligence were a proximate cause of injury to Ms. Hogan; (4) Ms. Hogan's total damages were $7,328,190.99; and (5) Dr. Fealk was 60 percent at fault and Sacred Heart was 40 percent at fault for the injuries.

PRESENTATION OF PROPOSED JUDGMENTS.
After trial, both parties presented their proposed judgments. Ms. Hogan sought entry of a judgment for the total amount of the jury award, or $7,328,190.99. Sacred Heart *393 sought entry of judgment in the amount of $2,931,276.40, which represented its 40 percent liability attributable to Ms. Naser.
By letter ruling dated June 25, 1998, the court concluded that (1) it had ruled on vicarious liability before trial and would not address that issue again; (2) offset could not be addressed because no reasonableness hearing had been held on the Dr. Fealk settlement; (3) because the jury found Dr. Fealk was an agent of Sacred Heart, the hospital was liable for his conduct; (4) Sacred Heart may be entitled to an offset of the settlement amount, but would not be entitled to a percentage reduction of the 60 percent attributable to his conduct. The court indicated that it would hold Ms. Hogan's proposed judgment for one week pending a motion for a reasonableness hearing. If no such motion was received, the trial court indicated its intention to sign Ms. Hogan's proposed judgment.

THE REASONABLENESS HEARING.
Sacred Heart moved for a reasonableness hearing regarding the settlement with Dr. Fealk and his group. Ms. Hogan filed a brief supporting the reasonableness of the settlement. Sacred Heart filed declarations from Dr. Fealk, individually, and from Dr. Thomas Boubel, on behalf of Physicians Anesthesia Group, P.S., which state both were solvent exclusive of the limits of the liability insurance policy.
The trial court found that the settlement was reasonable because (1) it was for policy limits and close to one of the highest awards ever given in Spokane at the time; (2) it took into account liability and Ms. Hogan's pain and suffering and loss of limb; (3) it encompassed the "then known main tort feasor"; and (4) it took into account Ms. Hogan's needs as anticipated at that time. The court also concluded that Ms. Hogan was not required to look further for other assets at the time of settlement, and even if there were other assets, the settlement was reasonable. The court entered an order determining that the settlement was reasonable.

THE JUDGMENT AND POSTJUDGMENT.
The court ultimately entered judgment in the amount of $5,328,190.99, which represents the jury award, with an offset of $2 million for the settlement made with Dr. Fealk. Sacred Heart moved for reconsideration of the judgment, arguing that the issue of the effect of the release of a solvent agent was never considered by the court. Ms. Hogan filed a cross-motion for reconsideration, arguing that because Sacred Heart did not plead offset as an affirmative defense in its answer, it had waived the argument. The court denied both motions. Sacred Heart appealed.

SOLVENCY HEARING.
On appeal, this court remanded to the trial court for a hearing to determine if Dr. Fealk and the group were solvent as to Ms. Hogan's claim, which would thereby determine if Sacred Heart was vicariously liable for the jury award related to Dr. Fealk's negligence, with an offset for the $2 million settlement. The court stated that Dr. Fealk and the group would be considered solvent if they could fully compensate Ms. Hogan for Dr. Fealk's 60 percent share of Ms. Hogan's total damages as determined by the jury.
Subsequently, the trial court held a solvency hearing over the course of several days. Gary Brajcich testified on behalf of Nancy Hogan. He is an attorney, and part of his practice involves giving business advice to small businesses related to assets versus liabilities of certain companies. He testified that as he understood Hogan I, solvency should be determined by reducing the judgment to 60 percent and determining with insurance and assets available, if that amount could be satisfied. He explained that this analysis was slightly different because normally solvency means that a business is able to pay its debts in the ordinary course of business.
Mr. Brajcich testified that he reviewed business records including tax returns, financial statements, employment contracts, stock redemption agreements, corporate bylaws, and articles of incorporation. He also reviewed the depositions of Dr. Porter and Dr. Fealk. Mr. Brajcich opined that the board of *394 directors had a duty to pay the doctors, as of March 1995, to the exclusion of any claims made by Ms. Hogan. He explained that based upon the historic custom and practice of the group as well as the employment contracts, the board had a duty to fund the pension and to collect the account receivables to pay the salaries and bonuses to the doctors.
Mr. Brajcich based his opinion on the fact that as of March 1995, Ms. Hogan did not have a claim, but rather a contingent liability. In other words, because Ms. Hogan's claim had not been reduced to a judgment, her claim would be paid only after the board funded its pension, salaries, and bonus obligations. If those obligations were paid, Mr. Brajcich testified, there would be no funds to pay Ms. Hogan. Conversely, if Ms. Hogan was a judgment creditor, Mr. Brajcich conceded her claim would have priority over the other obligations.
Daniel J. Harper, certified public accountant, also testified on behalf of Ms. Hogan. Based upon generally accepted accounting principles (GAAP), he took exception with the statement of assets and liabilities prepared by the group's accountants. He stated that the report was a tax basis report, which represented a departure from GAAP. He explained that because the report was prepared on a cash basis, the report did not reflect accruing bonuses, profit sharing, and compensation. The report's biggest shortcoming, according to Mr. Harper, was that it failed to properly account for the liabilities and receivables of the group on an interim basis, as well as its deferred compensation. Additionally, Mr. Harper told the court that the bonuses paid to the doctors really are not bonuses, but are part of the physicians' salaries. He explained that the term "bonus" is used in the employment agreement in order to comply with certain Internal Revenue Service regulations. As a result of these deficiencies, Mr. Harper believed that the report did not truly reflect the financial condition of the corporation. Under Mr. Harper's valuation, the group's assets, as of March 1995, were insufficient to pay Dr. Fealk's liability for 60 percent of Ms. Hogan's damages.
Lowell Ruen testified on behalf of Sacred Heart. Mr. Ruen is a certified public accountant, who holds a law degree as well as a master's of law. Mr. Ruen testified that as he understood the court's direction in Hogan I, he was to identify the assets available, without reference to state and federal exemption laws, to determine if Dr. Fealk and the group were solvent. He explained that he understood that Dr. Fealk's retirement account was exempt from an execution on a judgment, but that Dr. Fealk could choose to voluntarily liquidate his assets. Mr. Ruen testified that under his calculations, Dr. Fealk and the group were solvent as of March 1995.
Mr. Ruen asserted that a judgment creditor would have priority over the unsecured creditors related to the cash in the bank and the group's receivables. Mr. Ruen also stated that if the corporation had taken the cash in the bank and paid that to Ms. Hogan, the group would still have a positive net worth after the payment.
Mr. Ruen further testified that he disagreed with Mr. Harper's conclusion that the funds in the bank account and the accounts receivable should be accrued as a liability for future retirement contributions, shareholder bonuses, and compensation. He explained that he believed that the bonus was discretionary and it would be too speculative to consider these items as liabilities.
Additionally, Mr. Ruen stated that the physician's employment agreement contained a contractual deferred compensation plan. He explained that this plan is not the type of plan typically covered by the employee retirement income security act and, therefore, the money contributed by the group to that plan would not be exempt from judgment.
After a hearing, the court issued an oral ruling in which the court stated:
As I look at Dr. Fealk and [the group], both had assets available, not subject to prior priority liability that were available for Nancy Hogan. Accordingly, I would determine that Dr. Fealk and [the group] were both solvent and had assets available to pay the $4,396,914, with a combination of insurance and other assets.
*395 Report of Proceedings (RP) at 558. In its written Findings of Fact and Conclusions of Law, the trial court found that "Dr. Fealk and the Physicians Anesthesia Group together had assets that could have been used to pay Ms. Hogan at least $4,396,914.59 as of March 14, 1995." Clerk's Papers at 421.
As a result, the court concluded that Dr. Fealk and the Physicians Anesthesia Group were solvent as to the claim of Ms. Hogan, because they could have fully compensated her for Dr. Fealk's 60 percent share of her total damages at the time of the settlement.
Ms. Hogan appeals.

ANALYSIS
Law of the Case  Hogan I. The law of the case doctrine usually requires adherence to decisions declaring the applicable law in previous appeals of the same case. Folsom v. County of Spokane, 111 Wash.2d 256, 263, 759 P.2d 1196 (1988). However, application of the doctrine is discretionary, and the court may reconsider the same legal issue in a subsequent appeal if the holding in the previous appeal is wrong, application of the law of the case doctrine would result in manifest injustice, and there would be no injustice to the other party. Folsom, 111 Wash.2d at 264, 759 P.2d 1196; see also RAP 2.5(c)(2).

THE ANESTHESIA GROUP AS AN AGENT OF SACRED HEART.
Ms. Hogan argues that no legal or factual basis exists to support this court's conclusion that the group was an agent of Sacred Heart. In support of this assertion, Ms. Hogan relies upon the jury verdict that does not include the group and emphasizes the jury never determined that the group was an agent of Sacred Heart. As Sacred Heart points out, Ms. Hogan has previously raised these issues, unsuccessfully. More importantly, the record contains sufficient evidence that conclusively establishes the group's agency relationship to Sacred Heart, despite the lack of a jury verdict on this issue.
When Dr. Fealk administered Ms. Hogan's interscalene block, he was an actual agent for the anesthesia group. The group, not Dr. Fealk personally, was the entity with whom Sacred Heart contracted to provide anesthesia services at the hospital. In administering Ms. Hogan's block, Dr. Fealk was acting as a member of the group pursuant to its contract with Sacred Heart. If Dr. Fealk was an apparent agent of Sacred Heart, then so was the actual principal for whom he was acting. It was through Sacred Heart's contract with the group that Ms. Hogan was able to establish that the group's employee, Dr. Fealk, was the ostensible agent of Sacred Heart. Because Dr. Fealk was acting on behalf of the group and was its actual agent at the time he administered the anesthesia to Ms. Hogan, Dr. Fealk and the group should be treated as a single person vis-a-vis Sacred Heart for purpose of contribution and for determinations of solvency and release. RCW 4.22.040(1).
For this court to revisit the issue, it must find both that the earlier decision was erroneous and that justice would be best served by a review of that decision. Sintra, Inc. v. City of Seattle, 131 Wash.2d 640, 652, 935 P.2d 555 (1997). In this regard, we note Ms. Hogan offers no principled reason why the assets of the group should not be available to fully compensate Ms. Hogan for Dr. Fealk's 60 percent share of fault. Ms. Hogan has failed to raise any issues that Dr. Fealk was not acting as an agent of the group when he fulfilled its contract with Sacred Heart. Moreover, the group had $1 million in available insurance that Ms. Hogan left on the table when she settled with Dr. Fealk and the group. Additionally, the group had other assets. Ms. Hogan's release of Dr. Fealk and the group foreclosed any possibility of Sacred Heart receiving contributions from either of them. Under the circumstances of this case, the court properly concluded that the trial court on remand should determine the solvency of both Dr. Fealk and the anesthesia group.

SOLVENCY IN RELATION TO 60 PERCENT OF THE VERDICT.
Next, Ms. Hogan argues that the court erred in Hogan I by measuring solvency against 60 percent of the jury verdict, instead of 100 percent. She contends that *396 Glover v. Tacoma General Hospital, 98 Wash.2d 708, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988) requires that when a plaintiff settles with a solvent agent for less than an amount that would fully compensate the plaintiff, the ability to pursue the principal is extinguished.
Ms. Hogan has also previously advanced this argument, unsuccessfully. In support of her argument, Ms. Hogan relies primarily upon Glover, and argues that Glover stands for the proposition that available assets are to be measured against the amount it would take to fully, not partially, compensate the plaintiff. Ms. Hogan reads Glover too narrowly. Glover does not address the measure of solvency related to the settlement of one of several defendants, and thus does not answer the question posed here.
Under RCW 4.22.070(1), in all actions involving the fault of more than one defendant, the trier of fact determines the percentage of total fault that is attributable to every entity. This includes all entities released by the claimant. Id. "A party shall be responsible for the fault of another person or for payment of the proportionate share of another party where both were acting in concert or when a person was acting as an agent or servant of the party." RCW 4.22.070(1)(a).
In this case, Ms. Hogan entered into a settlement agreement with Dr. Fealk, who acted as an agent of Sacred Heart. Because Dr. Fealk was an agent and not a principal, he cannot be held liable for fault attributed separately to Sacred Heart. Even if Dr. Fealk had proceeded to trial, he would not have been held liable for Sacred Heart's 40 percent proportionate share of liability. Thus, his solvency, or his ability to fully compensate Ms. Hogan, must as a matter of course be measured against his own liability  or 60 percent of the total verdict. This is because under no scenario was Dr. Fealk held responsible for the acts of Sacred Heart. As such, the court properly examined Dr. Fealk's and the group's solvency as to his proportionate share of the verdict.

SOLVENCY DETERMINATION.
Ms. Hogan argues that the trial court erred in the methodology it used to determine that Dr. Fealk and the anesthesia group were solvent at the time of the settlement. Specifically, Ms. Hogan argues that the court erred by considering assets that could not be reached by a judgment creditor. Specifically, she refers to the doctor's retirement and pension plan accounts. In its findings of fact, the court listed Dr. Fealk's assets, which included assets that could have been claimed exempt under state and federal law.
In Pickett v. Stephens-Nelsen, Inc., 43 Wash.App. 326, 717 P.2d 277 (1986), the court addressed the solvency issue in the context of a reasonableness hearing. In Pickett, the plaintiff settled with, and released, an agent prior to trial with the principal. The principal appealed the trial court's ruling that the settlement was reasonable. In its discussion of the reasonableness of the settlement, this court discussed the agent's solvency in terms of whether he could satisfy a judgment. Specifically, the court stated that the principal had failed to provide evidence to controvert the testimony "that there was neither liability insurance nor other assets from which to satisfy a judgment, and enforcement of any judgment would be difficult since [the agent] now resided in Alaska." Id. at 332, 717 P.2d 277. Similarly, in Perkins v. Children's Orthopedic Hospital, 72 Wash.App. 149, 157, 864 P.2d 398 (1993), the court stated: "The Glover court in effect treats the settlement, once approved in a reasonableness hearing, as the equivalent of a collected judgment in the Crown Controls[2] fact situation."
Ms. Hogan and her experts' method of determining solvency rested upon the theory that as of March 1995, Ms. Hogan merely had a claim, no filed lawsuit, and no judgment against Dr. Fealk or the group. Thus, they characterized her claim as a contingent liability or a liability that may never materialize. *397 This theory affected their calculations as to what assets Ms. Hogan would receive, based simply upon what assets were not otherwise encumbered. We disagree with this approach.
Rather, we are persuaded by the reasoning of Pickett. While it is true that as of March 1995, Ms. Hogan did not have a judgment, this fact is immaterial. On the date that the court conducted the solvency hearing, Ms. Hogan did have a judgment and a certain dollar amount representing Dr. Fealk's proportionate share of the liability. Moreover, if the case had not settled, and Ms. Hogan had obtained a judgment against Dr. Fealk and the anesthesia group, the court would examine the assets that were available to satisfy the judgment. This is not a voluntary standard, as urged by Sacred Heart, but rather a defined legal standard. That is, certain statutes and laws regulate the assets that are available for satisfying a judgment, and these are the statutes that we examine first in determining solvency.
Thus, the court should begin with the assumption that Ms. Hogan has a judgment against Dr. Fealk and the group in the amount the jury determined was their 60 percent proportionate share of liability, or a judgment for $4,396,915. There is $3 million in available insurance proceeds. This means the threshold amount for a solvency determination is $1,396,915. In listing Dr. Fealk's assets, the court included assets that are protected from execution of judgments. Even if Dr. Fealk is allowed these statutory exemptions, Dr. Fealk and the group have more than sufficient assets subject to attachment in excess of the threshold amount. The trial court judgment may be affirmed by any basis supported by the record. Wendle v. Farrow, 102 Wash.2d 380, 382, 686 P.2d 480 (1984).
Affirmed.
WE CONCUR: BROWN, C.J. and SCHULTHEIS, J.
NOTES
[1] This is the second time this case has been presented to this court. For the convenience of the reader, the facts stated in Hogan v. Sacred Heart Med. Ctr., 101 Wash.App. 43, 2 P.3d 968 (2000) (Hogan I) are repeated.
[2] Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988); in that case, the plaintiff sued the principal but was unable to collect; the plaintiff next sued the agent and obtained an judgment against the agent.